[No. C050992. Third Dist. Sept. 13, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND FOSS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II through X.

## COUNSEL

Carol A. Navone, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**NICHOLSON, Acting P. J.**—In this child molestation case, we conclude that the trial court was not required to allow the defense to inquire into whether a witness who was involved in the reporting of the molestation had a morbid fear of sexual matters. By this questioning, the defense hoped to establish that the witness, an adult female, had influenced the child to falsely report that defendant had molested the child. We conclude the trial court did not abuse its discretion in preventing the defense from embarking on this line of questioning.

Years ago, courts deemed the testimony of victims of sexual crimes suspect, reflecting attitudes and assumptions that have since been disproved and discarded. Based on this change in attitudes, assumptions, and law concerning witnesses who have been victims of sexual crimes, we conclude the trial court did not abuse its discretion. We reach this result despite a 1964 Court of Appeal opinion that found error after the trial court prevented the defense from questioning a witness (the victim's mother) concerning whether she had a morbid fear of sexual matters.

In the unpublished portion of this opinion, we reject defendant's other claims of prejudicial error. Accordingly, we affirm.

### PROCEDURE

The district attorney charged defendant in a first amended information with 11 counts of molestation crimes against Brittany, a child under the age of 14 and more than 10 years younger than defendant, as follows:

—Count 1: aggravated sexual assault of a child involving oral copulation (Pen. Code, former § 269, subd. (a)(4));[1]

—Count 2: forcible lewd act on a child (§ 288, subd. (b));

—Count 3: forcible lewd act on a child (§ 288, subd. (b));

—Count 4: forcible lewd act on a child (§ 288, subd. (b));

—Count 5: aggravated sexual assault of a child involving oral copulation (former § 269, subd. (a)(4));

---

[1] Hereafter, unspecified code citations are to the Penal Code. Since defendant committed his crimes, section 269, subdivision (a) has been amended in several ways. We here refer solely to the version of the statute existing in 2002, which was applicable to defendant's crimes.

—Count 6: forcible lewd act on a child (§ 288, subd. (b));

—Count 7: aggravated sexual assault of a child involving sexual penetration (former § 269, subd. (a)(5));

—Count 8: aggravated sexual assault of a child involving sexual intercourse (former § 269, subd. (a)(1));

—Count 9: lewd act on a child (§ 288, subd. (a));

—Count 10: lewd act on a child (§ 288, subd. (a)); and

—Count 11: sexual penetration on a child (§ 289, subd. (j)).

A jury found defendant guilty as charged, except for count 10 as to which it found defendant guilty of the lesser included offense of misdemeanor battery. The trial court sentenced defendant to consecutive indeterminate state prison terms of 15 years to life on counts 1 and 5; concurrent indeterminate terms of 15 years to life on counts 7 and 8; a consecutive term of six years on count 3; and concurrent terms of six years on counts 2, 4, 6, 9, and 11. The total state prison term imposed was a determinate term of six years plus an indeterminate term of 30 years to life.

## FACTS

*Background*

Brittany's natural father died before she was born, and her mother married defendant when Brittany was two years old. Brittany considered defendant to be her father and called him "Dad." Defendant and Brittany's mother had a child, Cameron, who was two years younger than Brittany. In 2002, when Brittany was 12 years old, her mother passed away, leaving Brittany in defendant's sole custody. They were living in Fresno.

Within just a few months after the death of Brittany's mother, defendant molested Brittany for the first time. Cameron was away at a friend's house, leaving Brittany and defendant in the house alone. Defendant told Brittany to come to his room because he wanted to talk about sex. The front door was locked. They went into defendant's bedroom, and defendant locked the bedroom door. Defendant told Brittany to take off her pants. She asked why, and defendant said it was because he needed to talk to her about sex and that he needed to show her. Brittany felt she could not argue with defendant. She

asked why they could not just talk about it, and defendant said that they could not because it was hard for him. He did not know how. Defendant told Brittany that sex is what boys wanted and he did not want Brittany to end up having sex with one of them. After Brittany's pants and underwear were off, defendant touched the outside of her vagina with his fingers, moving them around, for about 15 minutes. Defendant asked if it felt good, and Brittany replied that she did not know. Finally, defendant told Brittany to put her pants back on and told her she would not have to do that again. Defendant made Brittany promise not to tell anyone because they might think it was "weird" or they might "do something." Defendant told Brittany she could not leave because he was her father.

Defendant introduced Brittany and Cameron to a woman named Lisa Tennison. While visiting Tennison's house, Brittany and Cameron heard defendant and Tennison having sex. Defendant bought a motorcycle and left Brittany and Cameron with friends for a couple of weeks while he went on a trip to Sturgis, South Dakota. Defendant returned from the trip with a woman named Brandi Nichols, who was 21 years old.

Soon after the Fresno molestation, which was not charged in this case, and just two weeks before Brittany turned 13, defendant and the children moved to Redding. Until defendant found a place for them to live, they stayed with defendant's stepfather. After residing there for about a week, they moved to a residence on Irene Street. At first, Nichols visited occasionally to clean the house, but eventually she moved in. Brittany liked Nichols, considering her as a big sister, but not a mother figure.

*First Charged Incident—Residence of Defendant's Stepfather*

*—Count 1—Section 269, subdivision (a)(4) (Aggravated Sexual Assault of a Child (Oral Copulation))*

*—Count 2—Section 288, subdivision (b) (Forcible Lewd Act on a Child)*

On one evening while defendant and the children were living with defendant's stepfather, Cameron and defendant's stepfather went to ride quads (all-terrain vehicles). This left Brittany and defendant alone at the house. Defendant told Brittany that he needed to talk to her about sex again. She protested that they had already talked about it and asked if they really needed to talk about it again. Defendant said they did, and he took her into her bedroom. Defendant locked the door and made Brittany "pinkie-promise" that she would not tell anyone. Defendant told Brittany to take off her pants,

which she did because she did not know what else she could do. She felt like she could not say no because she felt he "overpowered" her and she could not say no to a parent. He told her to lie on the bed, and she did. She was taking off her underwear slowly when defendant intervened and pulled them down to her ankles. Defendant fondled Brittany's vagina with his fingers and then put his mouth on her vagina. After about 15 minutes, defendant said something about sperm, got off the bed, took off his pants and underwear, and rubbed his penis to make it hard. Defendant had Brittany touch his penis. He rubbed sperm on Brittany's stomach. When all of this was happening, Brittany just wanted it to be over. Defendant told Brittany to put her pants on and go wash herself. Brittany did not tell anyone about the incident because she did not know whom to trust.

*Second Charged Incident—Irene Street Residence*

*—Count 3—Section 288, subdivision (b) (Forcible Lewd Act on a Child)*

*—Count 4—Section 288, subdivision (b) (Forcible Lewd Act on a Child)*

Some time after defendant moved with Brittany and Cameron to the house on Irene Street, Cameron was away at a friend's house. Defendant locked the front door. Brittany could not remember if she and defendant were in her bedroom or defendant's bedroom. Defendant told Brittany to take off her pants and underwear and lie on the bed. She complied. Defendant opened Brittany's legs and fondled her vagina with his fingers. He then directed Brittany to do the same and "to feel the right spot." She touched herself for about five minutes while defendant watched. It made her feel "weird." Brittany told defendant she did not want to do it anymore. He said, "okay."

*Third Charged Incident—In the Closet*

*—Count 5—Former Section 269, subdivision (a)(4) (Aggravated Sexual Assault of a Child (Oral Copulation))*

*—Count 6—Section 288, subdivision (b) (Forcible Lewd Act on a Child)*

*—Count 8—Former section 269, subdivision (a)(1) (Aggravated Sexual Assault of a Child (Rape))*

About two or three months after the first incident in the Irene Street house, Brittany went to get shoes out of defendant's closet and found a dildo.[2] She

---

[2] Brittany referred to it as a "dildoy" in her testimony.

asked Nichols, who had moved in by then, what it was used for. Nichols would not answer Brittany's question and later told defendant about the question. Soon after Brittany talked to Nichols about the dildo, Brittany and defendant were again alone in the house. Defendant told Brittany that he had heard she asked Nichols about the dildo. Defendant asked Brittany if she wanted to know about it, and Brittany said she did. Defendant took Brittany into his bedroom, locking the bedroom door, and into the closet, also locking the closet door. Defendant retrieved the dildo from some folded clothes and told Brittany to lie down on the floor and take off her pants and underwear. He knelt next to Brittany, holding the vibrating dildo. Brittany, on the floor with her pants and underwear pulled down, was startled and wanted to know what defendant was going to do. Defendant held the dildo against Brittany's vagina. Stating that his mouth would work better, defendant put down the dildo and put his mouth on Brittany's vagina, moving his tongue around. Defendant took off his pants and put his penis on Brittany's vagina, "barely putting it in." Brittany told him she did not want him to do it because she was scared and did not want it to hurt.[3] Defendant stopped. Both Brittany and defendant were sweating so they left the closet. Defendant had a cigarette.

### Fourth Charged Incident—Digital Penetration

*—Count 7—Former section 269, subdivision (a)(5) (Aggravated Sexual Assault of a Child (Sexual Penetration))*

On an occasion that Brittany believed was different from the closet incident, defendant put his finger inside her vagina. It hurt her.

A "couple months" later, defendant told Brittany he needed to show her more about sex, she said, "No," and defendant replied, "Okay. I'm going to work now."

### Fifth Charged Incident—Defendant and Brittany Sleeping Together

*—Count 9—Section 288, subdivision (a) (Lewd Act on a Child)*

Defendant and Nichols had an argument, so she left the house. Cameron was also away at a friend's house, staying the night. Defendant told Brittany to come sleep with him. She did not want to, but defendant said, "Come on, we never get to sleep in the same bed." During the night, defendant put his fingers down Brittany's pants, touching her vagina. When the telephone rang, Brittany took the opportunity to go get in her own bed.

---

[3] When the prosecutor asked a followup question about how far defendant inserted his penis in her vagina, Brittany replied: "Not even close. It was like right up to my vagina and I told him, no."

*Sixth Charged Incidents—Horseplay*

*—Count 10—Section 242 (Battery)*

*—Count 11—Section 289, subdivision (j) (Sexual Penetration on a Child)*

While they were living in Redding, defendant sometimes gave Brittany "wedgies," which Brittany described as pulling up her underwear until it hurt, depending upon how hard defendant pulled. Sometimes her underwear would get bundled up and go up her vagina. When they were roughhousing once, defendant inserted his finger into Brittany's anal opening.

*Reporting of the Molestations*

In the summer of 2003, after living in Redding for about one year, defendant moved with Nichols, Brittany, and Cameron to Florida. On October 2 of that year, defendant, Cameron, and Brittany were roughhousing in a bedroom. Defendant lay on Brittany, hurting her, so she slapped his face. Defendant became angry, told Cameron to leave the bedroom, locked the door, and told Brittany he was going to give her a spanking. Defendant told Brittany to pull down her pants and underwear. She followed defendant's directions. She was in her pajamas and was not wearing a bra. Defendant told Brittany to pull her top over her head. As Brittany stood there exposed, defendant sat on the bed and stared at her. When she tried to pull her top back down, he pulled it back up over her head and told her to keep it there. Eventually, defendant told Brittany to put her clothes back on, and he left.

Brittany spoke to Nichols, who told Brittany she should not have slapped her father. Nichols explained to Brittany that she had found child pornography on defendant's computer and that Nichols's stepfather had molested her when she was young. Nichols expressed fear that defendant would have sex with Brittany. Nichols asked whether defendant had "done anything" to Brittany, and Brittany replied that he had.

Brittany and Nichols made a plan to leave the next day, and Nichols called her sister for assistance. Brittany and Nichols went to bed, but Nichols's sister called an abuse hotline. Chevelle Washington of the Florida Department of Children and Families responded to the call along with Officer Kevin McCollum of the Apopka Police Department. They arrived at defendant's residence about midnight. After speaking with Nichols, they awakened Brittany about 1:00 a.m. and questioned her. The interview lasted about 10 or 15 minutes. This was the only time Washington interviewed Brittany. The

interview was to assess the risk. It was not a forensic interview. Officer McCollum interviewed Brittany for about an hour at the police department after they transported Brittany there. This interview was also not intended to be a detailed, comprehensive interview concerning everything that had happened to Brittany. It was intended to get a basic idea of what law enforcement was required to do. Brittany signed a statement at 2:53 a.m.[4]

Brittany was taken to a group home, where she stayed for several weeks. During her stay at the group home, Brittany met a 17-year-old girl who described her sexual experiences to Brittany.

### Brittany's Alleged Animosity for Defendant

Defendant attempted to establish that Brittany did not like him. Defense counsel asked Brittany whether, prior to her mother's death, she liked defendant. Brittany replied that she "didn't really dislike him." She later told an officer who interviewed her that she had not liked defendant since she was five years old and wished that her mother would have divorced him. Brittany believed defendant had been cheating on her mother before her mother died. Brittany also did not like the fact that defendant was dating two women, Tennison and Nichols, at the same time.

Around the time of the death of Brittany's mother, Kaiser Hospital paid a settlement for malpractice. Brittany's aunt told Brittany that defendant may have spent the money. Brittany was under the impression that defendant was going to withhold the money from her.

### Defendant's Testimony

Defendant denied molesting Brittany. He testified that he never told her he was going to talk to her about sex or demonstrate it. He never orally copulated or touched her in any sexual way. One winter night, when the heater was not working, defendant made a fire in the fireplace and had Brittany sleep with him in a sleeping bag. He acknowledged giving Brittany "wedgies" but did not touch her bottom. He playfully bit her bottom at times when she had jeans on.

---

[4] Brittany testified that the interview at the police department was about five hours long. The accuracy of her estimation of time is doubtful, given that she did not arrive at the police department until around 2:45 a.m., she signed a statement at 2:53 a.m., and she left the station for placement at a group home about 3:45 a.m.

Defendant also testified that he and Nichols had discussed marriage. A week before the molestations were reported, defendant told Nichols that he would not marry her. They had a major fight.

## DISCUSSION

## I

### *Cross-examination of Brandi Nichols*

Before trial, defendant filed a motion requesting that he "be permitted to explore the existence of a morbid fear of sexual matters, in particular child molestation, of Brandi Nichols . . . ." The purpose of this evidence, according to defendant, was to show that this alleged obsession led Nichols to influence Brittany to make her claims that defendant molested her. The trial court denied the motion. On appeal, defendant claims the denial of this motion violated his rights to cross-examine and present a defense. We conclude the evidence was properly excluded and the trial court did not violate defendant's rights to cross-examine and present a defense.

Defendant's motion in limine stated that Nichols told Brittany that she found child pornography on defendant's computer and that defendant had visited Web sites concerning fathers molesting their daughters. After revealing this information, Nichols then asked Brittany if she had been molested, and Brittany replied that she had. Nichols told Brittany that she, too, had been molested and told Brittany she would not let it happen to Brittany again. Nichols and Brittany made a plan to leave together, but the plan fell through when Brittany was taken into protective custody.

In support of his request to "explore the existence of [Nichols's] morbid fear of sexual matters, in particular child molestation," defendant quoted at length a 1964 Court of Appeal case reversing the denial of a motion for new trial because the trial court had prevented the defendant from questioning the victim's mother concerning, in the words of the opinion, "advances made to her by various men." (*People v. Scholl* (1964) 225 Cal.App.2d 558, 562–564 [37 Cal.Rptr. 475] (*Scholl*).) As he did in the trial court, defendant relies on *Scholl* in making his argument on appeal.

We conclude that *Scholl* does not accurately reflect current law and should not be followed for three reasons. First, the *Scholl* court made no attempt to apply the appropriate standard of review to the question of whether the

questioning was properly limited. Second, the defense in *Scholl* apparently made no offer of proof concerning what evidence the attempted line of questioning would produce. And third, the assumptions and reasoning underlying the *Scholl* court's conclusion are no longer valid because they are outdated and have been disproved in the cases and statutes to be discussed below.

### People v. Scholl

In *Scholl*, the defendant was convicted of sexual offenses on an eight-year-old girl. (*Scholl, supra*, 225 Cal.App.2d at p. 560.) The victim's testimony was uncorroborated. (*Id.* at p. 561.) The defendant moved for a new trial, and the motion was denied. (*Id.* at p. 560.) On appeal from the order denying the new trial motion, the defendant argued, among other things, that the trial court erred by precluding him from asking the victim's mother whether the mother "had complained of advances made to her by various men." (*Id.* at p. 562.) Without mentioning the standard of review for exclusion of evidence or recounting any offer of proof by the defendant, the Court of Appeal concluded, "We think it was in error." (*Ibid.*)

The *Scholl* court based its finding of error on the unsupported apprehension that the victim's mother, whether because of malice or an "abnormal fear of and reaction to sexual relations," may have planted in the child a belief that the child had been molested. The court stated: "[S]uch cases usually involve . . . problems inherent in the testimony of a mother or other relative. Normally, it is from such a person that information of the alleged offense comes to the prosecution. But we know that, for some women, the normal concern for the welfare of their child may take an aggravated form. If the mother is abnormally oriented toward sexual conduct, and has an abnormal fear of and reaction to sexual relations, she may, quite unconsciously, build up, in her own mind, a quite innocent act or caress into a grievous wrong. Young children are especially suggestible. The inquiries put by such a mother to her daughter may, themselves, implant into the child's mind ideas and details which existed only in the fears and fantasies of the adult. Once implanted, they become quite real in the mind of the child witness and are impervious to cross-examination." (*Scholl, supra*, 225 Cal.App.2d at p. 563.)

### Standard of Review

Generally, "[a] trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292 [25 Cal.Rptr.3d 337, 106 P.3d 990].) More specifically, "[t]rial judges

retain 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' [Citations.] A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705 [47 Cal.Rptr.3d 326, 140 P.3d 657] (*Ledesma*).)

The *Scholl* court made no mention of a standard of review and did not purport to apply the abuse of discretion standard. Instead, it merely stated, "We think it was in error." (*Scholl, supra*, 225 Cal.App.2d at p. 562.)

■ Precedent that fails to apply the appropriate standard of review is of questionable value because it is little more than untethered personal opinion. In such a case, principles of law are discussed with no point of reference. They are not circumscribed by proper deference to the appellate standard of review.

An abuse of discretion standard requires the reviewing court to uphold the exclusion of evidence unless the reviewing court finds the trial court acted arbitrarily, capriciously, or in a patently absurd manner *and* that the exclusion of the evidence resulted in a *manifest* miscarriage of justice. (*Ledesma, supra*, 39 Cal.4th at p. 705.) The *Scholl* court made no such findings, but concluded, "it seems to us error to deny to the defendant a reasonable opportunity to explore the not impossible existence of such a morbid fear of sexual acts in the mind of the mother as to make the charge a creature of that morbidity." (*Scholl, supra*, 225 Cal.App.2d at p. 564.)

Perhaps prompted by the *Scholl* decision, defendant also fails to identify the proper standard of review in his opening brief. He quotes from a case of the United States Supreme Court concerning the right to cross-examine: "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' [Citation.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 684, 106 S.Ct. 1431].) This quote does not answer the question of whether the evidence was properly excluded; it *asks* the question, stating that

a constitutional violation occurs only if the prohibited cross-examination was "otherwise appropriate." As noted above, whether the cross-examination was appropriate and should have been allowed is subject to the abuse of discretion standard.

■ When an appellant fails to apply the appropriate standard of review, the argument lacks legal force. "Arguments should be tailored according to the applicable standard of appellate review." (*Sebago, Inc. v. City of Alameda* (1989) 211 Cal.App.3d 1372, 1388 [259 Cal.Rptr. 918].) When they are not so tailored, the appellant fails to show error in the judgment. "Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error. [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [43 Cal.Rptr.3d 741].)

Defendant's failure to apply the appropriate standard has resulted in his failure to establish, or even assert, that his motion to cross-examine Nichols was denied arbitrarily, capriciously, or in a patently absurd manner or that the denial resulted in a manifest miscarriage of justice. (See *Ledesma, supra*, 39 Cal.4th at p. 705.) Accordingly, his contention fails.

In any event, a contention that the trial court abused its discretion in denying defendant's request to inquire into whether Nichols had a morbid fear of sexual matters and child molestation would fail. As discussed below, the trial court's ruling was not an abuse of discretion because (1) defendant failed to make an adequate offer of proof and (2) the assumptions and reasoning underlying the *Scholl* opinion are outdated and have been disproved.

### Offer of Proof

■ When a trial court denies a defendant's request to produce evidence, the defendant must make an offer of proof in order to preserve the issue for consideration on appeal. Evidence Code section 354 states the rule: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means . . . ."

Even if a question such as the one posed in *Scholl*, concerning whether the witness (the victim's mother) had complained of advances by various men, is posed on cross-examination and the trial court prevents the defense from delving into the issue, the defendant must still make an offer of proof to preserve the issue for consideration on appeal, unless the issue was within the scope of the direct examination. Normally, if the trial court excludes evidence on cross-examination, no offer of proof is necessary to preserve the issue for consideration on appeal. (Evid. Code, § 354, subd. (c).) However, "[c]ross-examination is limited to the scope of the direct examination. (Evid. Code, § 773.)" (*Nienhouse v. Superior Court* (1996) 42 Cal.App.4th 83, 93 [49 Cal.Rptr.2d 573].) If the evidence the defendant seeks to elicit on cross-examination is not within the scope of the direct examination, an offer of proof is required to preserve the issue. (*Ibid.*)

" ' "Before an appellate court can knowledgeably rule upon an evidentiary issue presented, it must have an adequate record before it to determine if an error was made." [Citation.]' [Citation.] 'The offer of proof exists for the benefit of the appellate court. The offer of proof serves to inform the appellate court of the nature of the evidence that the trial court refused to receive in evidence. . . . The function of an offer of proof is to lay an adequate record for appellate review. . . .' [Citation.]" (*Nienhouse v. Superior Court, supra*, 42 Cal.App.4th at pp. 93–94.)

In *Scholl*, there is no indication that the question concerning whether the victim's mother had complained of advances by various men was within the scope of the direct examination. Most likely it was not, since the *Scholl* court recounted no testimony on the subject from the direct examination. Instead, the *Scholl* court appears to have speculated concerning what testimony might have been elicited by the question and what bearing the answer might have had on the witness's credibility. This mode of review is simply too speculative to be reliable and practical. Accordingly, *Scholl* is further weakened as legal authority because it does not account for the requirement that an offer of proof be made in order to preserve the issue for consideration on appeal.

Because defendant was unspecific and made only the most speculative offer of proof in support of his request to inquire into whether Nichols had a morbid fear of sexual matters and child molestation, he cannot establish, on appeal, that the trial court's denial of his request was an abuse of discretion. Defendant's motion stated that he wished to question Nichols "to establish that [Nichols's] morbid fear of sexual matters, (including such fear of particular child molestation [*sic*]), and the charges are a creature of that morbid fear." "An offer of proof should give the trial court an opportunity to

change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.] To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued. [Citations.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53 [51 Cal.Rptr.2d 185].)

Here, defendant did not give a specific offer of proof of evidence to be produced. His offer was conclusory and concerned only the area of questioning. It did no more than speculate as to what might be proven, reciting the "morbid fear" language from *Scholl*. This speculation and lack of specificity was inadequate to preserve the issue for consideration on appeal.

### Modern Approach

■ Even if the *Scholl* decision reflected attitudes and assumptions acceptable in its era concerning the questioning of witnesses other than a complaining witness in a sex crime case, those attitudes and assumptions have changed, rendering the *Scholl* opinion archaic. Just as the testimony of victims of sexual crimes is no longer deemed inherently suspect, we conclude the testimony of a noncomplaining witness in a sex crime case who may have been a victim herself of unwanted sexual attention or advances, likewise should not be inherently distrusted.

The California Supreme Court used the archaic view in deciding a case in 1966 involving whether a trial court should allow the defense to obtain an involuntary psychiatric evaluation of the complaining witness to impeach that witness's credibility. (*Ballard v. Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838] (*Ballard*).) In *Ballard*, the court relied on "prominent psychiatrists" who "explained that a woman or a girl may falsely accuse a person of a sex crime as a result of a mental condition that transforms into fantasy a wishful biological urge. Such a charge may likewise flow from an aggressive tendency directed to the person accused or from a childish desire for notoriety. [Citations.]" (*Id.* at p. 172.) The *Ballard* court noted the "trend" of allowing the defense to delve into evidence of mental and emotional instability of the complaining witness to impeach her. It wrote of the "danger of psychotically induced charges." (*Id.* at p. 173.) The court therefore established a rule authorizing trial judges to order a complaining witness to submit to involuntary psychiatric examinations if the complaining witness's claims have little or no corroboration. Evidence from a psychiatric examination performed under these circumstances could be used to impeach the credibility of the complaining witness. If a complaining witness refused to

be examined, the defense could comment to the jury on this refusal. (*Id.* at pp. 176–177.)

Although *Ballard* discussed only the complaining witness and did not mention evidence concerning claims of sexual offenses adduced from witnesses other than the complaining witness, the same speculative assumptions and faulty reasoning as that found in *Scholl* were used. In fact, the *Ballard* court cited, with apparent approval, though without comment, the decision in *Scholl.* (*Ballard, supra,* 64 Cal.2d at p. 174.)

Two years after its decision in *Ballard,* the Supreme Court decided *People v. Russel* (1968) 69 Cal.2d 187 [70 Cal.Rptr. 210, 443 P.2d 794], in which the court held it was an abuse of discretion to exclude testimony by a psychiatrist who had examined the complaining witness in a sex offense. The *Russel* court held that the trial court should have admitted the psychiatric testimony on the issue of the credibility of the complaining witness: "[H]aving in mind the rationale and objective of *Ballard* and the danger in sex offense cases that the charge may rest on the credibility of the child as against the bare denial of the defendant, we think that the legal discretion of the judge should be exercised liberally in favor of the defendant. [Citation.]" (*Id.* at p. 198.)

The assumptions and reasoning of *Ballard* and *Russel* have now been rejected: "The distrust of complaining witnesses in sex offense cases that formed the foundation for *Ballard* and *Russel* was based on antiquated beliefs that have since been disproved and discarded. Both the Legislature and the California Supreme Court have modernized the law's treatment of sex offense victims. A trial court's discretion to order a psychiatric examination of a complaining witness in a sex offense case was eliminated by the Legislature in 1980. (*People v. Castro* (1994) 30 Cal.App.4th 390, 397 [35 Cal.Rptr.2d 839].) Subsequently, in *People v. Barnes* (1986) 42 Cal.3d 284 [228 Cal.Rptr. 228, 721 P.2d 110], the California Supreme Court declared that '[t]he [1980] amendment of section 261, subdivision (2) [deleting the resistance requirement], acknowledges that previous expectational disparities, which singled out the credibility of rape complaints as suspect, have no place in a modern system of jurisprudence.' (*Barnes,* at p. 302.) More recently, the California Supreme Court has recognized that the 1980 legislative prohibition on psychiatric examinations of complaining witnesses in sex crime cases 'overruled' the 'line of authority' established by *Ballard* and *Russel.* 'As defendant notes, earlier cases indicated a trial court should grant a defense motion for a psychiatric examination of the complaining witness in a sex-crime case where psychiatric evidence appeared necessary to assist the trier of fact in assessing the witness's *credibility.* (E.g., *People v. Russel*[, *supra,*] 69 Cal.2d 187,

193 . . . ; *Ballard*[, *supra*,] 64 Cal.2d 159, 171–177 . . . [noting, however, the general rule against impeachment by psychiatric evidence]; *People v. Duncan* (1981) 115 Cal.App.3d 418, 426–427 [171 Cal.Rptr. 406] [finding no abuse of discretion in denial of defense motion].) But the Legislature overruled this line of authority in 1980 by adopting Penal Code section 1112, which forbids courts from ordering psychiatric examinations of victims or complaining witnesses in sex-crime cases in order to assess their credibility.' (*People v. Anderson* (2001) 25 Cal.4th 543, 575 [106 Cal.Rptr.2d 575, 22 P.3d 347].)" (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1311–1312 [116 Cal.Rptr.2d 700], original italics.)

Because *Scholl* relied on the same assumptions and reasoning as *Ballard* and *Russel*, it no longer has binding or persuasive value. Based on the possibility that the mother of the complaining witness, to whom the complaining witness had first reported the molestation, may have suffered from an abnormal orientation toward sexual conduct, *Scholl* stated that the defendant should have been allowed to attempt to impeach the mother with the question concerning whether she had complained of advances made by various men. The law no longer recognizes a distrust of the testimony of someone based on having been a victim of unwanted sexual advances. Accordingly, the speculation that Nichols may have had a "morbid fear" of sexual matters, and based on that fear influenced Brittany, did not justify the defense's attempt to question her concerning that matter of speculation. The trial court did not abuse its discretion in denying the motion to question Nichols concerning a "morbid fear of sexual matters, (including such fear of particular child molestation [*sic*]) . . . ."

 Because the trial court's order denying defendant's motion to question Nichols on the matters discussed was not an abuse of discretion, the court did not violate defendant's rights to cross-examine or present a defense. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].)

II–X*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 113.

## DISPOSITION

The judgment is affirmed.

Butz, J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied October 10, 2007, and appellant's petition for review by the Supreme Court was denied January 3, 2008, S157470. Werdegar, J., did not participate therein.