Filed 8/17/21  In re M.M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.M., <br><br> Defendant and Appellant. | F081266 <br><br> (Super. Ct. No. JV7981) <br><br><br> **ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on August 17, 2021, be modified as follows:

In the second to the last sentence of the first paragraph of the Discussion on page 10, change the word "jurisdictional" to "dispositional".

The modification does not change the judgment.

SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P.J.


MEEHAN, J.

Filed 8/17/21  In re M.M. CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.M., <br><br> Defendant and Appellant. | F081266 <br><br> (Super. Ct. No. JV7981) <br><br> **OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Tuolumne County.  Frank Dougherty.  (Retired Judge of the Merced Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Cherie D'Arcy for Plaintiff and Respondent.

-ooOoo-

J.M. ("father") and S.Y. ("mother") are the parents of M.M., a girl born in 2015. Father challenges the juvenile court's dispositional order in this dependency case.  He

contends the juvenile court erred in bypassing him for reunification services pursuant to Welfare and Institutions Code, section 361.5, subdivision (c)(2),[1] after finding he had caused the death of a child by abuse (§ 361.5, subd. (b)(4)). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2019, father and mother were not living together but shared custody and visitation of M.M. without a custody agreement or court orders. They were never married but had a good co-parenting relationship. M.M. was usually in father's care every day, or at least every other day, because of mother's work schedule.

Mother reported that father provided well for M.M. There were no reports of domestic violence during father and mother's relationship. Mother said father used to be known as a "hothead" when he drank liquor, but now he only has an occasional beer. Father reported he suffered from depression but was not medicated and instead used exercise to manage symptoms.

In January 2019, father was in a relationship with Nicole S. On January 14, 2019,[2] Nicole asked father to watch her 23-month-old son, K.S., while she went to work. K.S. was sick with influenza. He had been seen by a physician on January 11 for suspected bronchitis or sinus infection.

On January 14 around 2:30 p.m., Nicole dropped K.S. off at father's house before heading to work. K.S. was feeling better that day, and waved goodbye to Nicole as she drove away. Father lived in his house with his close friend, Skyler. Skyler saw K.S. when he was dropped off and stated K.S. appeared to have a cold but was "fine" and "his same whiny self." Skyler stated K.S. still "seemed fine" and was watching T.V. on the couch when Skyler left for work around 9 p.m.

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] All references to dates are to dates in 2019 unless otherwise noted.

2.

Nicole returned from work around 11:45 p.m. and saw K.S. on the couch. K.S. was breathing. Nicole changed out of her work clothes and talked with father in the bedroom "for a while" before returning to get K.S. from the couch. K.S.'s eyes were rolling back in his head and he was lethargic and limp. She tickled his feet and ears to try to wake him. K.S.'s body would stiffen but he was not responding. Nicole got in the shower with K.S. but K.S. still was not responding, and she stated they needed to go to the emergency room. Nicole and father immediately took him to the hospital and arrived there around 12:45 a.m. on January 15.

K.S. was airlifted to UC Davis Medical Center and arrived there at 4:00 a.m. Later that afternoon at 3:18 p.m. K.S. began experiencing heart trouble and eventually lost heart rhythm. A code blue was called and resuscitation efforts commenced. After consulting with medical staff, K.S.'s family agreed continued efforts would only be harmful and elected they stop. K.S. was pronounced dead at 3:34 p.m. A doctor at UC Davis reported that K.S. died of non-accidental injuries involving "many body systems" that were "severe and fatal." That doctor's impression was that the injuries were "most consistent with severe abusive head trauma and abdominal trauma."

On January 16, 2019, the Department removed M.M. from parental care and placed her in her paternal grandparents' home in Sonora. Paternal grandmother reported it was a difficult time emotionally for M.M. to be removed from father's care. She stated M.M. would ask to be taken to "daddy's house" or cry and say "I want to go with Mommy and Daddy."

On January 18, father had a positive visit with M.M. at the Department's offices. A social worker observed father to be playful, engaged, and connected to M.M. He reportedly "met each of [M.M.'s] needs throughout the visit needing no prompting or coaching." M.M. was "giggly and talkative" and "highly interactive, laughing and continually pursued connection with her father."

3.

That day, the Department filed a petition in the juvenile court alleging M.M. came within the jurisdiction of the juvenile court pursuant to section 300, subdivisions (b) and (f). Specifically, in two paragraphs the petition claimed M.M. was at risk because a non-related child, K.S., had died from non-accidental trauma of the brain and body while in father's care, that mother allowed M.M. to stay with father unsupervised, and that mother did not believe that father could harm a child.

At some time, father cut off all communication with Nicole after telling her she had ruined his career because of the investigation. Nicole became very upset and was not eating and eventually suffered a miscarriage of father's unborn child. Nicole attempted to contact father when she was in the hospital, but father never responded. Nicole told the investigating social worker that the "whole incident" with K.S. did not make sense and that she believed father "did something." Nicole also stated father showed no emotion regarding K.S.

On January 23, the court held a contested first appearance hearing where it heard evidence from the investigating social workers. Father argued, through his counsel, the Department had failed to present "any evidence" that he inflicted "those injuries" on K.S. or that he was a risk to his own child, M.M. The court disagreed, finding the Department had established by prima facie evidence K.S. suffered injuries resulting in his death while in father's care, and, accordingly, found M.M.'s care and protection required the court to remove her from parental custody. The court ordered visitation be provided to the parents.

On March 26, the social worker visited M.M. at her paternal grandparents' home. Paternal grandmother reported M.M. was doing well and father was visiting regularly, sometimes daily. Father had not missed any visits and there were no reported problems. Grandmother said she knew of no domestic violence instances between father and any of his girlfriends. Grandmother explained father would "get short" at times, could be impatient, and she had seen him spank M.M. on the butt. When the social worker

4.

mentioned anger management, grandmother said father "could use anger management" because he had unresolved trauma.

The social worker spoke with paternal grandmother and father again on April 18. Father was then attending parenting classes. He said he did not know what could have caused K.S.'s head trauma.

By September 2019, father was fully engaged in services which included parenting, mental health services, and regular visitation with M.M. He had attended ten parenting sessions and was observed at a September 5 visit to employ skills he learned in his classes. Around this time, the social worker observed a visit at the parental grandparents' home and concluded father and M.M. had a good relationship. The social worker reported "the two are bonded," M.M. "expresses comfort and playfulness" in father's presence, and father is "attentive and engaging" with M.M. Father had been participating in individual counseling for seven months where he was addressing PTSD, grief, and depression. Father visited M.M. at his parents' home daily. He was also seeing M.M. weekly for supervised visits at the Tuolumne Visitation Center. The social worker reported about these visits:

> "Tuolumne Visitation Center reports … father's behavior to be consistent and kind towards [M.M.]. During their visits, they played with puzzles and games, built forts, and played outside. [Father] also helps with the transition for the mother's visit and the two act appropriately during the visits. [Father] has shown consistency in being present for [M.M.] and there have been no reports of harm or worries regarding his behavior towards her."

The social worker reported M.M. was very comfortable and loving with paternal grandparents.

By November 2019, M.M. remained with her paternal grandparents and father was visiting her every day. The social worker noted father was loving toward M.M. and

showed no signs of anger or inappropriate behavior during December 18, 19, and 26 visits.

On January 2, 2020, father met with the investigating social worker. He reported he was working fulltime, doing "all right" emotionally, and was having regularly scheduled Department-supervised visitation with M.M. on Wednesdays and Thursdays. The social worker met with M.M. on January 9, 2020 and observed her to be healthy, developmentally normal, and emotionally sound. When the social worker arrived and knocked on the door to paternal grandparents' home, she could hear M.M. joyfully exclaim, "daddy's here," thinking it was father knocking. M.M. described being eager to see father and ran to the door to greet him when he arrived.

By February 2020, Father's circumstances had not materially changed. He still lived in Sonora and visited M.M. almost every day and continued with parenting and anger management classes and counseling sessions.

### A. The jurisdictional hearing and findings

The court held jurisdiction hearings for four days from February 18 through 21, 2020. The court heard testimony from numerous witnesses, including three doctors,[3] father, paternal grandmother, father's roommate Skyler, and mother.

On February 26, 2020, the court recited detailed factual findings regarding K.S.'s death. The court's detailed findings are summarized as follows.

K.S. died on January 15, 2019, from injuries to his abdomen and brain. The abdominal injuries consisted of a "complex liver laceration" and a broken rib. The tears in his liver resulted in "lakes of blood" and the liver tissues were filled with blood. K.S. had "markedly and extremely elevated liver enzymes" that "clearly indicate[d]" liver

---

[3] The Department called Dr. Michael Ferenc, a forensic pathologist for Stanislaus County, and Dr. Julia Magana, a pediatric emergency medicine physician at UC Davis Children's Hospital. Father called Dr. Steven Gabaeff, a "clinical forensic medicine" physician with an expertise in child abuse cases.

damage. The Glisson's capsule which covers the liver was ruptured, allowing blood to leave the liver. K.S.'s liver "was clearly subjected to blunt force trauma, which was significant, and would and did result in an extremely painful event." The liver damage was not the result of a "simple fall."

A CT scan performed at the local hospital revealed "a pool of blood between the brain and outer covering and excess fluid within the tissue[s]." An angiogram CT performed at UC Davis Medical Center "demonstrated edema spread over a wide area and blood between the tissue and the covering of the brain on the left frontal lobe." There was minimal blood flow through the veins and arteries in the brain. K.S. was diagnosed with an axonal injury as well as a "diffuse severe anoxic injury" to the brain. The diffuse severe anoxic injury was caused by a combination of an acceleration and deceleration of the brain in the skull. He was also diagnosed with a "hypoxic/ischemic" injury caused by the brain having received insufficient oxygen and blood. The liver damage and the brain damage would have been fatal by themselves. The damage to the liver occurred first, and the brain damage accelerated K.S.'s death.

At 2:30 p.m., K.S. was his "usual whiny self," and at 9:15 p.m., Skyler observed K.S. playing in the bathtub "just being a kid." Skyler observed K.S. to be fine and watching T.V. when he left for work that evening. Sometime after 9:45 p.m. but before 10:27 p.m., father was the only person in K.S.'s presence and caused blunt force trauma to K.S.'s liver "either by throwing him toward an object such as a metal couch arm that caused blunt force trauma to his abdominal area or using one of his limbs where an item with a broad surface could cause the blunt force laceration to K.S.'s abdominal area."[4]

---

[4] This finding was apparently based on two things: (1) a text message from father to Nicole on January 15, 2019, stating, "The only time I even saw [K.S.] fall was on his butt, and he got right back up. He bumped his head on the metal rest on my couch, but he didn't hit it hard at all."; and (2) testimony from the forensic pathologist that K.S.'s abdominal injuries could have been caused by a strike from a "broad surface" such as a shin or forearm.

This injury would have resulted in extreme pain that would have caused K.S. to uncontrollably cry until father became frustrated. Father then vigorously shook K.S.'s head and body to try to get him to stop crying.

Nicole stated she once saw father pick up K.S. "violently and vigorously" and on one occasion saw father become angry and shake K.S. Nicole stated father would force-feed M.M. and once also tried to force-feed biscuits and gravy to K.S. A social worker reported Nicole said father would "play rough by throwing the kids in the air and throwing them on a mattress." These statements and reports were consistent with paternal grandmother's stated belief that father could use anger management counseling because he had unresolved trauma.

The court ultimately found there was sufficient evidence establishing father's acts were "a substantial factor contributing to [K.S.]'s death." The court found the allegations in the petition true, and specifically found M.M. came within the provisions of section 300, subdivisions (b)(1) and (f). The court also found by clear and convincing evidence, for purposes of section 361.5, subdivision (b)(4), that father caused the death of K.S. through abuse. The court set a dispositional hearing.

## B.     Subsequent proceedings and dispositional hearing

By March 2020, father remained in Sonora and reported he had almost completed anger management classes. He planned to continue therapy as he could afford it. The investigating social worker observed father had a good family relationship and did not abuse drugs. Father said he loved his daughter very much and wanted to maintain a relationship with her.

Father was having twice weekly visitation supervised by the Department and was also visiting almost every day at paternal grandparents' home. Father's visits were positive, and paternal grandmother reported father was more calm and measured in redirecting M.M. during visits than he used to be. M.M. was loving and happy toward father and father was attentive toward M.M. Paternal grandmother reported M.M. would

always ask for more time during video and telephone calls and asked about father almost every day.

In its disposition report, the Department recommended no reunification services be provided to father "due to the potential harm and safety risks that may or may not occur while individually caring for … [M.M.]" However, the Department recommended services be provided to mother. The Department maintained this position at the dispositional hearing. The court heard testimony from father's therapist and M.M.'s paternal grandmother. Father's therapist also submitted an anger assessment pertaining to father.

The court concluded father had not met his burden under section 361.5, subdivision (c)(2), of showing by clear and convincing evidence that reunification with father was in M.M.'s best interest, and accordingly ordered reunification services not be offered to father. The court stated it had "great concern as to whether or not [father] could … be a safe person for [M.M.] to be around." The court further explained it was clear father needed anger management counseling, and while father did attend counseling, the court "lack[ed] real insight into Mr. [M.'s] understanding of his anger problem." The court did, however, order that reunification services be provided to mother.

The court found M.M.'s care and protection required she be removed from parental custody, declared a dependent child of the juvenile court, and placed under the Department's supervision, with placement in paternal grandparents' home. The court ordered father be provided daily telephonic visits with M.M.

On June 5, 2020, father filed a notice of appeal from the jurisdictional and dispositional orders.[5]

---

[5] According to public court records, on January 25, 2021, father was charged with violating section 187, subdivision (a), section 273ab, subdivision (a), and section 273a,

9.

Father challenges the trial court's decision to bypass reunification services for him. Specifically, he contends we must reverse because he carried his burden below of showing reunification with him was in M.M.'s best interest. Father does not challenge any of the court's factual findings made in connection with either the jurisdictional hearing or dispositional hearing; he only challenges the court's ultimate conclusion that reunification with father was not in M.M.'s best interest. As such, his appeal only concerns the jurisdictional order. We find no error and affirm.

## A. Applicable law and standard of review

Section 361.5, subdivision (a) sets forth the general rule that a parent whose child has been removed in a dependency proceeding must be provided reunification services. There are, however, exceptions listed in subdivision (b) of section 361.5 that allow the juvenile court to deny reunification services. Relevant here is section 361.5, subdivision (b)(4), which provides in relevant part: "(b) Reunification services need not be provided to a parent … described in this subdivision when the court finds, by clear and convincing evidence, …. [¶] … [¶] (4) That the parent or guardian of the child has caused the death of another child through abuse or neglect."

When any of the section 361.5, subdivision (b) exceptions apply, "[t]he court shall not order reunification … unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) In such a case, "the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) As this court recognized in *In re Ethan N.* (2004) 122 Cal.App.4th 55 (*Ethan N.*), "when child abuse results in the death of a child,

---

subdivision (a) in Tuolumne County Superior Court Case No. CRF65707 in connection with the death of K.S. Father's trial is set for March 28, 2022.

10.

such abuse 'is simply too shocking to ignore' in determining whether the offending parent should be offered services aimed at reunification with a surviving child. 'The fact of a death and a subsequent petition … arising out of that death simply obliterates any possibility of reunification …." (*Id.* at p. 65.) Nevertheless, the Legislature has left open a " 'tiny crack' " to parents who have been responsible for the death of a child through abuse or neglect. (*Ibid.*) The burden is on the parent to change the legislative assumption and show that reunification would serve the child's best interest. (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*).)

Courts should consider the following four factors in determining whether reunification would serve the child's best interest, particularly when the parent has been found to have caused the death of a child through abuse or neglect: (1) The "parent's current efforts and fitness as well as the parent's history"; (2) the gravity of the problem that led to the dependency; (3) the strength of the relative bonds between the child and the parent and the child and his or her caretakers; and (4) the child's need for stability and continuity. (*Ethan N., supra,* 122 Cal.App.4th at pp. 66—67.)

When the party with the burden of proof fails to meet his or her burden, on appeal the question "becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question is whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support [the] finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

"A juvenile court has broad discretion when determining whether … reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion." (*William B., supra,* 163 Cal.App.4th at p. 1229.)

"When an appellant fails to apply the appropriate standard of review, the argument lacks legal force." (*People v. Foss* (2007) 155 Cal.App.4th 113, 126 (*Foss*).)

11.

" 'Arguments should be tailored according to the applicable standard of review.' " (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.) "When they are not so tailored, the appellant fails to show error in the judgment. 'Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error.' " (*Foss,* at p. 126.)

## B.     Analysis

Father argues he provided sufficient evidence to support a finding reunification was in M.M.'s best interest.  Father methodically analyzes each of the factors from *Ethan N., supra,* 122 Cal.App.4th at pp. 66—67, highlighting the facts tending to favor reunification.  He specifically contends, "The court abused its discretion by denying father family reunification services because the evidence supported it."  This statement implies that because there was evidence sufficient to support a finding that reunification was in M.M.'s best interest, we must reverse.  But this is incongruent with the standard of review.

Father's argument proceeds as if the standard of review were de novo—as if we could reweigh the evidence and supplant the lower court's view of the evidence with our own.  But, as we have explained, the question for us is not whether the evidence merely *supported* a contrary lower court finding, but whether it *compelled* a contrary finding.  Father does not even attempt to argue the evidence compelled a contrary finding, and for that reason he has failed to demonstrate error in the judgment.  (*Foss, supra,* 155 Cal.App.4th at p. 126.)  In any event, we conclude a contrary finding was not compelled.

The most significant factor that precludes a compelled finding that reunification was in M.M.'s best interests was the circumstances of K.S.'s death.  Section 361.5, subdivision (b)(4), covers deaths caused by "abuse or neglect."  K.S.'s cause of death was not negligent or accidental in nature.  Rather, the fatal abuse was intentional and brutal.

K.S. was struck or thrown multiple times, resulting in fatal abdominal and brain injuries and a broken rib, leaving K.S. in "extreme" pain for over an hour before Nicole came home. This was all in addition to the discomfort he was already experiencing from influenza. This was a very long time for anyone, much less a 23-month-old, to languish with those types of injuries without medical treatment. Father demonstrated callousness by leaving K.S. to suffer in extreme pain without promptly getting K.S. to the hospital. Needless to say, K.S. did nothing to deserve what happened to him; it was unprovoked. The facts and circumstances surrounding K.S.'s death are disturbing.

As we have stated, father does not even attempt to argue that the evidence compelled the court to find reunification was in M.M.'s best interest, and the record reveals that such a finding was not compelled. We are aware of the facts father claims support a finding reunification was in M.M.'s best interest. Father was participating in therapy and taking classes and was visiting M.M. virtually every day. Father and M.M. had an undeniably strong, loving bond. M.M. loved and missed her father. Father's efforts are commendable and no doubt were relevant to the lower court's decision. However, despite these favorable facts, the circumstances of K.S.'s death are too egregious for us to conclude the lower court was compelled to find reunification was in M.M.'s best interest. We also are mindful of the prior incident where father shook K.S. in frustration, as well as of the trial court's uncertainty as to whether father understood his anger problem. We cannot say the trial court was compelled to provide reunification services when it was unconvinced father had a handle on his anger problem, especially when father's loss of temper is what caused K.S.'s death.

Therefore, under the standard of review applicable here, we cannot reverse the trial court's orders, and affirm.

13.

## DISPOSITION

The trial court's jurisdictional and dispositional orders are affirmed.


SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P.J.


MEEHAN, J.