Filed 2/18/21  Certified for Partial Pub. 3/12/21 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GONZALO ERNESTO PAREDES,<br><br>    Defendant and Appellant. | D076086<br><br><br>(Super. Ct. No. SCD255519-02) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Spolin Law and Aaron Spolin for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and James M. Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

A jury found Gonzalo Ernesto Paredes guilty of 35 counts of offering or delivering compensation for workers' compensation patient referrals (Lab.

Code, § 3215) (workers' compensation fraud) and 16 counts of concealing an event affecting an insurance claim (Pen. Code, § 550, subd. (b)(3)) (insurance fraud).

The trial court sentenced Paredes to an aggregate term of five years in prison, consisting of the upper term of five years on one of the counts of insurance fraud, concurrent five-year upper terms on the other counts charging that same offense, and concurrent three-year upper terms on each of the workers' compensation fraud counts.

On appeal, Paredes claims that the prosecutor committed misconduct during his examination of one of the witnesses and during closing argument by suggesting the existence of facts not in evidence. Paredes also maintains that the trial court erred in excluding, as hearsay, an unavailable witness's testimony from a prior federal trial. Finally, Paredes contends that there is insufficient evidence to support the verdicts.

We affirm the judgment.

## II.

## FACTUAL BACKGROUND

In approximately 2002, Ruben Martinez (Ruben), and his son, Alex Martinez (Alex), opened a medical clinic in Calexico. In 2009, a chiropractor, Dr. Steven Rigler, moved his practice into the clinic and examined patients who were referred to him by Ruben and Alex and were receiving workers' compensation benefits. Dr. Rigler did not pay rent or utilities or contribute to the salaries of clinic staff. In exchange, Dr. Rigler permitted Ruben and Alex to determine the providers to whom Dr. Rigler's patients would be referred for ancillary medical services. These ancillary service providers compensated Ruben and Alex for the referrals, and Ruben and Alex split the referral fees evenly.

2

In approximately 2010, Paredes was the office administrator for an entity called Advanced Radiology, owned by Dr. Ronald Grusd. As described in greater detail in part III.A, *post*, Ruben entered into an oral agreement with Paredes, on behalf of Dr. Grusd, through which Advanced Radiology would pay Ruben a referral fee for patients referred to Advanced Radiology for magnetic resonance imaging (MRI) scans.[1] Thereafter, Paredes implemented the agreement with Ruben by, among other activities, receiving invoices from Ruben for patient referral fees and arranging payment of those fees to Ruben.

In 2014, Alex began to manage Dr. Rigler's chiropractic clinics in San Diego and Escondido. Dr. Rigler gave Alex control over the referral of his patients to outside providers for ancillary services. Alex entered into an arrangement with Paredes whereby Alex referred Dr. Rigler's patients to Advanced Radiology in exchange for compensation from Advanced Radiology. As with the Calexico clinic, Paredes played an integral part of implementing the referral scheme with respect to the San Diego and Escondido clinics, including establishing the referral arrangement and arranging payment of referral fees to Alex.

An entity owned by Dr. Grusd billed insurance companies for services provided to the patients referred to Advanced Radiology by Ruben and Alex.[2]

---

[1]   Ruben would split the proceeds with Alex evenly per their agreement.

[2]   As noted in footnote 11, *post*, Paredes failed to transmit any of the exhibits introduced as evidence to this court, and we were thus unable to review the exhibits demonstrating this fact. However, the prosecutor referred to these exhibits during closing argument and Paredes does not dispute that an entity owned by Dr. Grusd billed insurance companies for services provided to patients referred to Advanced Radiology by Ruben and Alex.

## III.

## DISCUSSION

A. *The prosecutor did not commit prosecutorial error during examination or closing argument*

Paredes claims that the prosecutor committed error[3] during his examination of Ruben by stating that Paredes and Ruben had entered into a contract. Paredes also contends that the prosecutor committed further error during his closing argument by stating that Paredes had admitted paying kickbacks.

1. *Governing law*

"The use of deceptive or reprehensible methods to persuade the jury constitutes [prosecutorial] misconduct." (*People v. Sánchez* (2016) 63 Cal.4th 411, 475.) " ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894 (*Covarrubias*).)

---

[3] While Paredes uses the term prosecutorial *misconduct*, as do many courts, we refer to the claim as raising one of purported prosecutorial *error*. (See *People v. Potts* (2019) 6 Cal.5th 1012, 1036 ["A claim of prosecutorial misconduct may have merit even absent proof that a prosecutor had 'a culpable state of mind.' [Citation.] For this reason, '[a] more apt description of the transgression is prosecutorial error' "].)

4

" ' "[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 335.) However, "[p]rosecutors may make vigorous arguments and fairly comment on the evidence; they have broad discretion to argue inferences and deductions from the evidence to the jury. [Citation.]" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 74 (*Reyes*).) " ' " ' "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets . . . .' " ' " ' " (*People v. Gamache* (2010) 48 Cal.4th 347, 371.)

  2. *Factual and procedural background*

    a. *The prosecutor's examination of Ruben*

      i. *Ruben's oral agreement with Paredes*

Ruben testified that he had a meeting with Paredes and Dr. Grusd during which Ruben reached an oral agreement with Paredes to refer patients for MRI scans to Advanced Radiology in exchange for $180 per scan. Ruben described the agreement as follows:

> "[The prosecutor:] So your conversations that we're talking about here is — in terms of the words going back and forth are between you and Gonzalo Paredes.
>
> "[Ruben:] Yes.
>
> "[The prosecutor:] Did Gonzalo Paredes offer you an alternative arrangement[4] by which MRIs could be referred to Advanced Radiology in exchange for something?
>
> "[Ruben:] Yes.
>
> "[The prosecutor:] What was that alternative offer?

_____

4 Ruben had previously testified that he had initially proposed to Paredes and Dr. Grusd that Advanced Radiology pay him $5,000 a month in exchange for referring patients to Advanced Radiology.

5

"[Ruben:] $180 per referred patients — or I should say for a scan.

"[The prosecutor:] For each MRI?

"[Ruben:] For each MRI.

"[¶] . . . [¶]

"[The prosecutor:] So kind of — at least from a purely financial standpoint, pretty attractive offer for you.

"[Ruben:] Yes, it was.

"[The prosecutor:] Did you accept it?

"[Ruben:] Yes, I did.

"[The prosecutor:] Was there any conversation after you — I assume you verbally accepted this, right?

"[Ruben:] Correct."

### ii. The defense's objection

Shortly after Ruben testified about the agreement with Paredes, Ruben said that Paredes had stated that "they wanted a signed contract before we proceed[ed]." The following exchange then occurred:

"[The prosecutor:] Okay. When is the first time that you saw a . . . contract or any type of proposed agreement?

"[Ruben:] It must have been two . . . , three days after.

"[The prosecutor:] So after your conversation, you left and went home.

"[Ruben:] Yes.

6

"[The prosecutor:] And then you received some sort of something.

"[Ruben:] Yes.

"[The prosecutor:] Did you take a look at it?

"[Ruben:] Yes.

"[The prosecutor:] I'm going to show you what's been marked for identification as People's Exhibit No. 89.

"(People's Exhibit 89 identified for the record.)

"Go ahead and — it's a multipage document. The very top of it says[,] 'Marketing Services Agreement.' "

The prosecutor proceeded to ask Ruben several questions about Exhibit 89 during which the following colloquy occurred:

"[The prosecutor:] It says, 'Contractor shall not deliver patients as compensation for money.' Do you see that?

"[Ruben:] Yes.

"[The prosecutor:] Was — was that — was your agreement with Mr. Paredes the exact opposite of what's written in that contract?

"[Defense counsel:] Your Honor, objection. Misstating the evidence. The agreement is signed by Dr. Grusd, not Mr. Paredes.

"The court: Overruled.

"[Defense counsel:] May we approach at side-bar?

"The court: Not now.

"[The prosecutor:] What I am talking about, as [*sic*] I am talking about the agreement that was reached when you were talking to . . . Gonzalo Paredes in that conference room with Dr. Grusd present about $180 per patient, you send the patients, they get treated, they give you $180 for every MRI.  Right?  That was the deal, right?

"[Ruben:] That was the deal.

"[The prosecutor:] And you were talking to Gonzalo Paredes when that happened, right?

"[Ruben:] Right.

"[The prosecutor:] Dr. Grusd was in the room.

"[Ruben:] Yes, he was.

"[¶] . . . [¶]

 "[The prosecutor:] Yes?  Okay.  So[,] did you believe that the — other than the $180 per scan, did it concern you that they're asking you to sign a contract that's the exact opposite of what you had verbally agreed to previously?

"[Ruben:] It was strange."

> iii.  *The trial court's denial of the defense's renewed objection and motion for a mistrial*

Outside the presence of the jury, defense counsel stated, "[M]y objection is [the prosecutor's] presenting to the witness an agreement, a contract that was signed by the witness and signed by Dr. Grusd, and he keeps referencing that it is Gonzalo Paredes'[s] agreement.  It is not.  It's clearly a contract with Advanced Radiology as Dr. Grusd as the president, signed by Dr. Grusd, not by Mr. Paredes, his office worker, and signed by this gentleman."  Defense counsel argued that it was misleading for the prosecutor to state "your

8

agreement with Mr. Paredes," and defense counsel requested that the jury be "admonished."

The prosecutor responded that Ruben and Paredes had reached an agreement during their conversation and that Paredes had later told Ruben that the written agreement was in effect, according to the prosecutor, a "sham marketing agreement designed to be cover for illegal activity."

After further argument, during which the defense moved for a mistrial based on the prosecutor's statement during his examination of Ruben to the effect that Ruben had entered into an agreement with Paredes, the trial court overruled the defense's objection and denied the request for a mistrial.

b. *The prosecutor's closing argument concerning Ruben's initial telephone call with Paredes*

Ruben stated the following concerning his initial telephone conversation with Paredes:

> "[The prosecutor:] So you call up Advanced Radiology, and you end up speaking to Gonzalo — a person you now know to be Gonzalo Paredes, correct?
>
> "[Ruben:] Correct.
>
> "[The prosecutor:] And how'd the conversation go?
>
> "[Ruben:] It went well.  He explained that yes, he did have a mobile unit, and it would be interesting servicing the patients that we had in Calexico.
>
> "[The prosecutor:] During this conversation, did you mention to Gonzalo Paredes that you were looking for a little bit more than just the mobile MRI but compensation?
>
> "[Ruben:] Yeah, I was a little bit more blunt than that.  I was looking for compensation.  Do you compensate for the referrals we send over[?]

"[The prosecutor:] What did Mr. Paredes say?

"[Ruben:] He said 'yes.'

"[The prosecutor:] What — did you discuss that any deeper in this particular phone call?

"[Ruben:] No. He invited me to go over, and we would have the conversation more in depth."

During his closing argument, the prosecutor stated:

"[W]hy is Gonzalo Paredes a perpetrator? Well, you saw and you listened to all the evidence, but think about the fact that Gonzalo Paredes himself negotiated that deal with Ruben Martinez. That's who was saying the words back and forth to one — to one another in that room. Ruben Martinez initially called before he even went there, spoke to Gonzalo Paredes, Gonzalo Paredes says yeah, we have a mobile MRI and yeah, we pay kickbacks. Come on, let's — see us, meet with . . . ."

The following colloquy then occurred:

"[Defense counsel]: Your honor, objection of the evidence [*sic*]. There is — no one ever said that —

"The court: Rely on your recollection of the evidence.

"[Defense counsel]: I would ask the [c]ourt to instruct the prosecutor —

"The court: No speaking objections. Please continue."

3. *Application*

    a. *The prosecutor did not commit prosecutorial error during his examination of Ruben*

Paredes claims that the prosecutor committed error by stating that Paredes had "entered into a contract" with Ruben. Paredes argues that

"[t]his . . . misstatement of fact was . . . highly prejudicial to Mr. Paredes because it imputed a level of knowledge and responsibility to Mr. Paredes that was not only false, but evidentially nonexistent."

To begin with, the prosecutor did not say that Paredes had "entered into a contract" with Ruben, as Paredes argues in his brief. Rather, the prosecutor stated that Paredes and Ruben had reached an "agreement." The prosecutor's statement was clearly supported by the evidence. As outlined in part III.A.2.a, *ante*, Ruben stated that he and Paredes had a conversation during which Ruben accepted Paredes's offer for Advanced Radiology to pay Ruben $180 per MRI scan performed on patients that Ruben referred to Advanced Radiology. In addition, the prosecutor asked Ruben whether "you send the patients, they get treated, they give you $180 for every MRI," was "the deal." Ruben replied, "That was the deal."

Further, the prosecutor's examination of Ruben, quoted in part III.A.2.a, *ante*, makes clear that the prosecutor was not contending that Ruben had entered into a *written* contract with Paredes, as defense counsel's objection suggested. On the contrary, the prosecutor made clear the People's theory that Ruben and Paredes had entered into an illegal *oral* agreement providing for a payment of compensation to Ruben in exchange for patient referrals, and that Advanced Radiology had subsequently provided Ruben with a sham *written* contract that contained terms that were inconsistent with that oral agreement, presumably to conceal the true nature of the arrangement.

In sum, the prosecutor's reference to an "agreement" between Paredes and Ruben during the prosecutor's examination of Ruben was supported by the evidence and did not amount to prosecutorial error.

11

b. *The prosecutor did not commit prosecutorial error during closing argument*[5]

With respect to the prosecutor's closing argument, Paredes contends that the prosecutor suggested in his closing argument that Paredes had "*admitted* to participating in the scheme when no such evidence exists in the record."

Throughout the trial, witnesses, the prosecutor, and defense counsel all used the term "kickback" to refer to compensation provided in exchange for patient referrals in the workers' compensation industry.[6] Thus, taken in context, it is clear that the prosecutor was referring to evidence that Paredes

---

[5] We reject the People's contention that Paredes forfeited this aspect of his prosecutorial error claim. Defense counsel expressly objected to the prosecutor's remarks during closing argument. In addition, when defense counsel requested an admonition from the court, the court interrupted defense counsel, and stated, "No speaking objections."

Thus, defense counsel both objected to the prosecutor's argument and requested an admonition. In addition, it is clear from the trial court's remark that any further requests would have been futile. Under these circumstances, Paredes's claim was preserved. (See *People v. Caro* (2019) 7 Cal.5th 463, 510 [stating that "[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must object and request an admonition," and that an exception to the preservation requirement exists if the objection or request for admonition would have been " 'futile' "].)

[6] For example, during the prosecutor's questioning of a special agent concerning a prior investigation involving Advanced Radiology, the following colloquy occurred:

> "[The prosecutor:] Did you mention anything to Gonzalo Paredes that your investigation revealed potential kickbacks, and by that I mean payment in exchange for patient referrals?
>
> "[Special Agent:] Yes, I did."

12

told Ruben during their initial phone call that Advanced Radiology would provide compensation for referrals. While it would have been improper for the prosecutor to have purported to quote Paredes as having used the word "kickback," since there was no evidence that Paredes had in fact used that word, the prosecutor's argument, fairly interpreted, merely paraphrased Ruben's testimony pertaining to the phone call. Accordingly, the prosecutor's closing argument reflected a fair comment on this evidence and did not constitute prosecutorial error. (See *Reyes*, *supra*, 246 Cal.App.4th at p. 74.)

B. *Paredes cannot demonstrate that the trial court committed reversible error in precluding the defense from offering Dr. Grusd's former testimony as evidence in this case because neither a transcript of the former testimony nor an offer of proof as to the nature of that testimony is contained in the record*

Paredes claims that the trial court erred in excluding, as hearsay, Dr. Grusd's testimony from a prior federal trial. We need not consider the merits of the trial court's ruling because Paredes failed to either make an offer of proof as to the nature of Dr. Grusd's former testimony or to lodge a transcript of that testimony in the record. Therefore, even if the trial court erred in excluding the evidence,[7] we have no basis on which to determine whether any such error would have been prejudicial.

1. *Factual and procedural background*

Prior to trial, the People filed a motion in limine to preclude the defense from offering in evidence, on hearsay grounds, Dr. Grusd's testimony from a

---

[7]    We emphasize that we do not intend to suggest that the trial court erred in excluding the evidence. Rather, we hold that we need not consider the merits of the trial court's ruling because it is clear that Paredes cannot establish prejudice, as is required.

13

prior federal trial.[8]  In their motion, the People explained that, if called as a witness at trial, Dr. Grusd was expected to invoke his Fifth Amendment privilege against self-incrimination.  The People argued that Dr. Grusd's testimony from the federal trial was not admissible pursuant to the former testimony exception to the hearsay rule outlined in Evidence Code section 1291[9] for several reasons, including that the People had not been a party to the federal action, as is required for the exception to apply.

---

[8]    In their motion, the People explained that this case arose out of a joint federal and state investigation into workers' compensation fraud in California.  The People described the prior federal action as follows:

> "Paredes and . . .Grusd . . . were tried in federal court in . . . 2017.  Grusd was found guilty on all 42 counts that went to the jury.  The jury hung on Paredes'[s] counts.  The federal case against Paredes was subsequently dismissed by the government, without prejudice, pending his trial on state charges."

[9]    Evidence Code section 1291 provides in relevant part:

> "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and:
> "(1) The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion or against the successor in interest of such person; or
> "(2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  (Italics added.)

Paredes filed an opposition in which he argued that the former testimony was admissible because "the state and federal prosecutions are unquestionably intertwined."[10] (Capitalization omitted.)

Prior to the trial, the court held a hearing on the People's motion. At the outset of the hearing, the defense stated that it would submit on its written opposition. The prosecutor argued that Dr. Grusd's prior testimony was hearsay and was not admissible pursuant to Evidence Code section 1291 because the People had not been a party to the federal action.

The trial court excluded the evidence, ruling:

> "It's clear to the Court that the federal trial testimony is hearsay. There doesn't appear to be any exception to the hearsay rule, and it doesn't come in under Evidence Code 1291. The parties in this case — well, the People were not a party to the earlier action in federal court so these are different actions, different parties, so there's no exception, so I'm granting the motion . . . to exclude the admission of Defendant Grusd['s] federal trial testimony."

After the trial court made its ruling, the defense moved for a mistrial based on the court's ruling, which the trial court denied.

2. *Governing law*

Evidence Code section 354 provides in relevant part:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that:

---

[10] While Paredes's opposition did not discuss the specific requirements of Evidence Code section 1291, he did contend that the People were seeking to "abuse the spirit" of that provision in excluding the former testimony.

"(a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means;

"(b) The rulings of the court made compliance with subdivision (a) futile;"

It is well established that "[t]o preserve an evidentiary ruling for appellate review, the proponent of the evidence must make an offer of proof regarding the anticipated testimony. (See *People v. Whitt* (1990) 51 Cal.3d 620, 648 [(*Whitt*)].)" (*People v. Carlin* (2007) 150 Cal.App.4th 322, 334.) The *Whitt* court explained that one of the purposes of this requirement is that an "appellate court must know the 'substance' or content" of the excluded evidence in "in order to assess prejudice." (*Whitt, supra,* at p. 648, italics omitted.) Absent evidence as to the nature of the excluded evidence, a reviewing court has no basis on which to assess prejudice, as is required before reversing a judgment. (See, e.g., *People v. Foss* (2007) 155 Cal.App.4th 113, 127–128 (*Foss*) [stating that an offer of proof "provide[s] the reviewing court with the means of determining error and assessing prejudice"]; Evid. Code, § 354.)

One of "[t]he function[s] of an offer of proof is to lay an adequate record for appellate review." (*Foss, supra,* 155 Cal.App.4th at p. 127.) Where the record contains no information as to the substance of the excluded evidence, the defendant fails to present an adequate record for review and his evidentiary claim may be deemed forfeited. (See, e.g., *People v. Johnson* (2018) 6 Cal.5th 541, 571 [rejecting claim that defendant's testimony from prior trial should have been admitted in evidence because "[d]efendant forfeited any claim about his prior testimony by failing to offer it in evidence below. (See Evid. Code, § 354.)"].)

3. *Application*

The record does not contain either a transcript or recording of Dr. Grusd's former testimony or an offer of proof as to the nature of that testimony. Further, in his briefing on appeal, Paredes does not discuss the nature of the excluded testimony, nor does he explain how the exclusion of that evidence resulted in a miscarriage of justice.

Under these circumstances, we conclude that Paredes has not demonstrated that the trial court committed reversible error in precluding the defense from offering Dr. Grusd's former testimony in evidence. (See *Whitt*, *supra*, 51 Cal.3d at p. 648; Evid. Code, § 354.)

C. *There is substantial evidence to support the verdicts*

Paredes claims that there is insufficient evidence in the record to support the jury's guilty verdicts with respect to either the workers' compensation fraud counts (Lab. Code, § 3215) or the insurance fraud counts (Pen. Code, § 550, sub. (b)(3)).

1. *Standard of Review*

In *People v. Smith* (2005) 37 Cal.4th 733, 738–739, the California Supreme Court outlined the standard of review governing claims of insufficient evidence in criminal cases:

> "In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' [Citations.] [¶] ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial

17

judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' "

"Thus, to prevail on a sufficiency of the evidence argument, the defendant must present his case to us consistently with the substantial evidence standard of review. That is, the defendant must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict. [Citation.] If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574 (*Sanghera*).)

2. *There is substantial evidence to support the jury's verdicts finding Paredes guilty of violating Labor Code section 3215*

a. *Governing law*

Labor Code section 3215 provides:

"Except as otherwise permitted by law, any person acting individually or through his or her employees or agents, who offers, delivers, receives, or accepts any rebate, refund, commission, preference, patronage, dividend, discount or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring clients or patients to perform or obtain services or benefits pursuant to this division, is guilty of a crime."

18

b. *The People presented overwhelming evidence of Paredes's violations of Labor Code section 3215, which Paredes fails to address in his brief on appeal*

Ruben testified that Paredes told him that Advanced Radiology would provide compensation for referrals. Ruben also stated that he reached an agreement with Paredes pursuant to which Ruben would refer patients to Advanced Radiology for MRI scans in exchange for $180 per scan. Ruben stated further that he signed a written marketing agreement that contradicted the terms of the oral agreement after Paredes assured Ruben that he would not be required to comply with the terms of the written agreement, which required the legitimate marketing of Advanced Radiology. Ruben further explained that he was not provided with promotional materials and he did not attempt to market Advanced Radiology. Ruben stated that he was in frequent contact with Paredes concerning various aspects of their referral agreement, including requesting and receiving payments.

Alex testified that he reached a similar agreement with Paredes concerning patient referrals from clinics in San Diego and Escondido to Advanced Radiology. For example, in discussing the scheme, the prosecutor asked Alex, "Did you refer patients for money?" Alex responded, "Yes." Alex stated that he sent invoices to Paredes for referral fees that he was owed pursuant to the scheme, and that he communicated with Paredes about those fees. The People also presented evidence that Alex received referral fees pursuant to the scheme.

In addition, the People presented recordings of conversations that Dr. Rigler had recorded that corroborated Alex and Ruben's testimony. In one of the conversations, Paredes, Alex and Ruben discussed amounts that Advanced Radiology owed for referrals. The People also offered in evidence

19

numerous documents that corroborated the testimony above, including invoices, e-mails, and checks consistent with Alex and Ruben's testimony concerning the scheme.

The People also presented evidence tending to show Paredes's consciousness of guilt. For example, Paredes rounded payments to Alex and Ruben up or down so that they did not appear "funny," he split up large payments so as not to attract attention, he instructed Alex not to include "numbers" in e-mails requesting payment, and he referred to a check that he was going to send as a "document."

Paredes fails to discuss *any* of this evidence in his briefing on appeal or to explain why it is insufficient to support the jury's verdicts finding him guilty of violating Labor Code section 3215.[11] Accordingly, we conclude that Paredes has failed to demonstrate that there is insufficient evidence to support the jury's verdicts finding him guilty of violating Labor Code section 3215. (See *Sanghera*, *supra*, 139 Cal.App.4th at p. 1574 [describing an appellant's burden in raising a claim of insufficiency of the evidence on appeal].)

> c. *Paredes's arguments to the contrary are unpersuasive*

Paredes claims that he could not be found guilty of violating Labor Code section 3215 because he was merely "an office manager" and "[t]he offer or delivery of compensation," came only from Dr. Grusd. We are not persuaded. A reasonable jury could find that a person, such as Paredes, who

[11] Further, despite raising a claim that the evidence is insufficient to support his convictions, Paredes's appellate counsel has not requested transmission to this court of any of the documentary exhibits offered at trial. (See Cal. Rules of Court, rules 8.320(e) & 8.224(a).) We remind counsel that it is appellant's responsibility to have transmitted to this court all exhibits that are necessary to permit review of appellant's claims on appeal.

negotiates kickbacks, reviews invoices for kickbacks, and facilitates the payment of kickbacks (see part III.C.2.b, *ante*),[12] has "offer[ed] or deliver[ed] . . . consideration . . . as compensation," as defined in Labor Code section 3215. Further, Paredes cites no case law that supports his contention that a person who engages in such conduct does not commit a criminal offense.

Paredes also argues that he lacked the *mens rea* to commit a violation of Labor Code section 3215 because his "knowledge was limited to an understanding that his boss, Dr. Grusd, had a contract for legitimate marketing services with [Alex and Ruben]."[13] In light of the evidence discussed in part III.C.2.b, *ante*, the jury could clearly find that Paredes knew that he was offering or delivering compensation for patient referrals. In short, the People presented ample evidence that Paredes had sufficient

---

12    As noted in part III.C.2.b, *ante*, in presenting his sufficiency claim on appeal, Paredes fails to address any of the evidence related to this conduct.

13    Paredes also suggests that the People were required to prove that he had "knowledge that the payments made were illegal . . . . " We are aware of no authority supporting this assertion, and Paredes cites none. Knowledge of illegality is *not* required in order to prove a violation of Business and Professions Code section 650, a related antikickback statute. (See *People v. Guiamelon* (2012) 205 Cal.App.4th 383, 405 ["under [Business and Professions Code section 650] the defendant need not know his or her conduct is unlawful"].) Further, the jury was specifically instructed, "It is not a defense to the crime of Labor Code Section 3215 that the defendant did not know he was breaking the law or that he believed his act was lawful."

In addition, even if there were a requirement that Paredes knew that kickbacks was illegal, the People presented evidence that Paredes has such knowledge. Specifically, a Department of Insurance investigator testified that she met with Paredes in 2015 and that he told her that he understood that kickbacks were illegal.

knowledge of the referral scheme to support the jury's guilty verdicts on the Labor Code section 3215 counts.

3. *There is substantial evidence to support the jury's verdicts finding Paredes guilty of violating Penal Code section 550, subdivision (b)(3)*

Paredes contends that there was insufficient evidence to find him guilty of violating Penal Code section 550, subdivision (b)(3) pursuant to the natural and probable consequences doctrine of conspirator liability. Specifically, he argues that a violation of Penal Code section 550, subdivision (b)(3) is not a natural and probable consequence of a violation of Labor Code section 3215 because "[c]oncealing a fact from an insurance company is not 'closely related' to an alleged payment of a kickback for the referral of patients."

a. *Governing law*

Penal Code section 550 provides in relevant part:

"(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

"[¶] . . . [¶]

"(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled."

b. *Natural and probable consequences doctrine*

" '[A] defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime [nontarget crime] that is the "natural and probable consequence" of the target crime.' [Citation.] To find an aider and abettor guilty of a nontarget crime under the natural and probable consequences theory, the jury must find that the defendant aided and abetted

22

the target crime, that a coparticipant in the target crime also committed a nontarget crime, and that this nontarget crime was a natural and probable consequence of the target crime the defendant aided and abetted." (*People v. Hardy* (2018) 5 Cal.5th 56, 92.)

"The natural and probable consequences doctrine applies equally to aiders and abettors and conspirators." (*Covarrubias*, *supra*, 1 Cal.5th at p. 901.)

### c. *Application*

In accordance with the elements of the natural probable consequences doctrine outlined above, the People's theory at trial was that: (1) Paredes conspired with Dr. Grusd to commit the target crime of workers' compensation fraud (Lab. Code, § 3215) (i.e., by paying referral fees for workers' compensation patient referrals); (2) Dr. Grusd committed the nontarget crime of insurance fraud (Pen. Code, § 550, subd. (b)(3)) (i.e., by concealing that kickbacks had been paid for the referrals when billing insurance companies); and (3) insurance fraud was the natural and probable consequence of the workers' compensation fraud.[14]

---

14     For example, the prosecutor stated in closing argument:

> "Now, think about the liability of co-conspirators. . . . [Paredes] conspired to commit a violation of Labor Code [section] 3215, illegal kickbacks; a member of the conspiracy committed the 550(b)(3), the insurance fraud, the submitting of bills to the insurance company, and here it's Dr. Grusd. It's Dr. Grusd who's submitting the bills to the insurance company, so a member of the conspiracy, Dr. Grusd, committed the insurance fraud. And that insurance fraud under 550(b)(3) is a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit, illegal kickbacks. Is it a natural and probable consequence? Then [Paredes is] guilty of the [Penal Code, section] 550[, subdivision] (b)(3)."

Paredes challenges only the final element, contending that concealing information from an insurance company pertaining to a patient's insurance claim (Pen. Code, § 550, subd. (b)(3)) is not " 'closely related' " to the payment for a referral of the patient (Lab. Code, § 3215). Paredes's argument is unpersuasive.

The People presented ample evidence from which the jury could find that the purpose of providing compensation for patient referrals was to obtain payment from insurance companies for services provided to those patients.[15] The People also presented evidence that it is unlawful for providers to seek reimbursement from insurance companies for services performed on patients referred to them in exchange for compensation, and that insurance companies are forbidden by law from paying claims for services that they know have been referred in exchange for compensation. Thus, Dr. Grusd's commission of the crime of concealing the kickbacks from the insurance companies was closely related to the conspiracy to pay the kickbacks, since the purpose of the kickback scheme (to obtain money from insurance companies for the provision of services) could not have been accomplished but for the concealment of the kickbacks.

---

[15]    For example, Ruben testified:

> "[The prosecutor:] So you and your son refer patients from your clinics to medical providers who then provide treatment and bill insurance companies?

> "[Ruben:] Yes.

> "[The prosecutor:] And in exchange those medical providers give you money back, correct?

> "[Ruben:] Correct.

> "[The prosecutor:] On a per-patient-per-service basis?

> "[Ruben:] Yes, that's pretty much how it worked."

Accordingly, we conclude that insurance fraud (Pen. Code, § 550, subd. (b)(3)) was a natural and probable consequence of the conspiracy to commit workers' compensation fraud (Lab. Code, § 3215), in which Paredes participated. We therefore conclude that there is substantial evidence to support the jury's verdicts finding Paredes guilty of violating Penal Code section 550, subdivision (b)(3) pursuant to the natural and probable consequences doctrine.

## IV.

## DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

25

Filed 3/12/21

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GONZALO ERNESTO PAREDES, <br><br> Defendant and Appellant. | D076086 <br><br><br> (Super. Ct. No. SCD255519-02) <br><br><br> ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The opinion in this case filed February 18, 2021, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED in part.

IT IS HEREBY CERTIFIED that the opinion meets the standard for publication specified in California Rules of Court, rule 8.115(c), with the exception of part III.A and part III.B of the Discussion; and is ordered published in the Official Reports in conformity with this order.

---

*     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.A and part III.B of the Discussion.

McCONNELL, P. J.

Copies to:  All parties