Filed 5/27/26  P. v. Jamerson-Keosodsay CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>v.<br><br>DARRION ELIJAH JAMERSON-KEOSODSAY,<br>        Defendant and Appellant. | C101883<br><br>(Super. Ct. No. 23FE000894) |

After a jury found defendant Darrion Elijah Jamerson-Keosodsay guilty of felony unlawful possession of a firearm and three misdemeanor counts of drawing and exhibiting a firearm in an angry or threatening manner, the trial court imposed an upper term sentence of three years in prison for his felony conviction and three consecutive one-year sentences in county jail for his misdemeanor convictions.

Jamerson-Keosodsay raises five claims on appeal, three of which the People concede are meritorious.  He contends the trial court erred by (1) granting his request to represent himself (see *Faretta v. California* (1975) 422 U.S. 806) and (2) later failing to revoke his self-representation during trial.  We reject those claims.  He also contends (3) the trial court improperly imposed the upper term on the felony offense by considering an aggravating factor that the jury did not find; (4) the trial court improperly refused to award him certain sentencing credits without giving him notice that it might do so; and (5) his conduct can support only one conviction for drawing and exhibiting a

1

firearm in an angry or threatening manner, not three convictions.  We agree with the People that these claims have merit.

Accordingly, we affirm the felony conviction and one misdemeanor conviction, we reverse two of the misdemeanor convictions, and we remand the matter for a full resentencing.

## BACKGROUND

During a 2022 altercation, Jamerson-Keosodsay swung his pistol in the direction of several people.  A January 2023 criminal complaint alleged he thereby committed four offenses:  one felony count of unlawful possession of a firearm within 10 years of a certain misdemeanor conviction (Pen. Code, § 29805, subd. (a)(1))[1] and three misdemeanor counts of drawing and exhibiting a firearm in an angry or threatening manner (§ 417, subd. (a)(2)).  In December 2023, his attorney expressed doubt that he was mentally competent to stand trial.  In May 2024, a court appointed psychologist who evaluated Jamerson-Keosodsay opined in a report that he was competent to stand trial and there was a "high likelihood" he was feigning psychiatric or cognitive disorders.  Accordingly, the trial court reinstated criminal proceedings.

I

*Waiver of Right to Counsel*

During a hearing on the day before trial was scheduled to begin in July 2024, defense counsel announced she was not ready, and Jamerson-Keosodsay stated he wished to represent himself "as opposed to a continuance over his objection."  The trial court asked Jamerson-Keosodsay, "[k]nowing your attorney is not able to go forward on that

---

[1] Undesignated statutory references are to the Penal Code.  Section 29805 lists many misdemeanors that trigger the 10-year ban on possessing a firearm.  Jamerson-Keosodsay's misdemeanor was battery against a person with whom he had a dating relationship.  (§ 243, subd. (e)(1).)

case tomorrow … what would you like to do, sir?" He replied, "I would still like to proceed … pro per."

Court then recessed for approximately 35 minutes while Jamerson-Keosodsay reviewed and completed portions of a four-page form entitled "ADVISEMENT AND WAIVER OF RIGHT TO COUNSEL (*Faretta* Waiver)." After the recess, the trial court addressed Jamerson-Keosodsay: "[Y]ou … want to represent yourself … because the very fine attorney that you have sitting next to you was just assigned this case last week and she's not had the opportunity to prepare for a trial, and she's asked to continue this matter until August 12th so she can file all of the correct motion work …. [¶] There are all kinds of issues involved in a jury trial, but as I understand it, sir, since tomorrow is the sixtieth day,[2] you no longer want to waive time, which is fine. You want to represent yourself because you are unwilling to wait for a couple weeks for this lawyer to get up to speed." Jamerson-Keosodsay responded, "I have waited nine months." The trial court replied, "That's fine. You and I are going to go over what you have initialed twice."

The colloquy that followed spans approximately 26 pages of the reporter's transcript. We summarize it here for brevity.

The trial court began by confirming Jamerson-Keosodsay's awareness of his rights. It asked, "[Y]ou understand you have a right to an attorney. Correct?" Jamerson-Keosodsay replied, "Yes." The court continued, "You understand that you have a right to a speedy and public jury trial?" Jamerson-Keosodsay again answered, "Yes." The court then asked, "You understand that you have a right to subpoena witnesses and records. Correct?" Jamerson-Keosodsay responded, "Yes."

---

[2] "[U]nless good cause to the contrary is shown," a trial court must dismiss a criminal action in a felony case when the defendant "is not brought to trial within 60 days of the defendant's arraignment on an indictment or information." (§ 1382, subd. (a), subd. (a)(2).)

3

The trial court followed up by asking, "Have you done that?" Jamerson-Keosodsay replied, "I would like a Statement of Decisions." The court responded, "I don't know what that means." Jamerson-Keosodsay then stated, "It's basically everything, like, a relief packet …." The trial court replied, "[T]his is just showing me this is not a good place for you to be making decisions because the language you are using is nonsensical to a criminal case."

Later, after confirming that Jamerson-Keosodsay's handwritten initials indicated he understood his constitutional rights described on the first page of the form, the trial court turned to the second page of the form, which cautions criminal defendants about potential difficulties of self-representation, including the challenges of contacting witnesses while in custody. The court asked, "Why didn't you fill out this form on page 2?" Jamerson-Keosodsay replied, "Don't agree with it. Don't understand it." The trial court responded, "That's a bad thing if you don't understand it." Jamerson-Keosodsay maintained, "Don't understand it and don't agree with it, two things that you need."

Shortly thereafter, the trial court asked, "So do you understand that you will have limited access to a telephone which will make preparations for trial more difficult? Do you understand that?" Jamerson-Keosodsay responded, "No, I do not." The court asked, "What's there not to understand about that?" Jamerson-Keosodsay replied, "Because I don't agree with it." The trial court explained that it was describing "the downfalls of representing yourself" and reiterated that Jamerson-Keosodsay would have limited telephone access. When asked again whether he understood, Jamerson-Keosodsay stated, "No. I do not understand that."

As the exchange continued, the trial court repeatedly attempted to secure Jamerson-Keosodsay's acknowledgment, while Jamerson-Keosodsay expressed frustration about restrictions on his ability to make phone calls. The court emphasized that Jamerson-Keosodsay, as a custodial inmate, did not have unlimited telephone access like persons who are out of custody, and asked whether he understood. Jamerson-

4

Keosodsay responded, "But I don't agree." The court stated, "I know you don't like that idea, but that is a fact," to which Jamerson-Keosodsay again replied, "I don't agree with it." The trial court reiterated that Jamerson-Keosodsay did not have unrestricted access to a telephone, and Jamerson-Keosodsay concluded, "I don't understand it and I don't agree with it." The trial court then stated, "Well, I'm making the finding he does understand it. He just doesn't like it."

The colloquy continued in this manner for several additional pages of the reporter's transcript. When the trial court asked whether Jamerson-Keosodsay understood various portions of the form warning of the dangers of self-representation, Jamerson-Keosodsay repeatedly responded that he did not understand and/or did not agree with certain statements. The trial court, however, consistently found that, although Jamerson-Keosodsay disagreed with or did not like the warnings, he nonetheless understood them.

At one point, when Jamerson-Keosodsay insisted he did not understand the written statement, "my right to act as my own attorney will not shield me from disciplinary actions within the jail and … I will be subject to the same disciplinary measures as all other inmates for misconduct occurring in the jail," the trial court responded, "Oh, sure you do. Yes, you do. In fact, the record will reflect that Mr. Jamerson is actually laughing."

Toward the end of the colloquy, the trial court emphasized the form's recommendation that Jamerson-Keosodsay accept a court appointed attorney and not act as his own attorney. The court asked, "Have I made that clear to you, that I do not think this is a good idea?" Jamerson-Keosodsay responded, "Yes … you have."

Finally, the trial court read aloud the following statement from the form: "I understand all that I have read and understood all the Court has told me. Having in mind all that I have been advised and all of the dangers and disadvantages of acting as my own attorney, it is still my request that I act as my own attorney." The court then asked, "Is

5

that still your request?"  Jamerson-Keosodsay replied, "I don't understand that and I don't agree with it."  The trial court responded, "Tell me what you don't understand about you requesting the right to represent yourself."  Jamerson-Keosodsay answered, "I filled out the form to the tee, Your Honor."  The court replied, "Again, that's why you and I are going over each and every paragraph."  Jamerson-Keosodsay then stated, "Like, Your Honor, can ask."

The trial court continued:  "I'm not asking you to initial anything.  That's why this record is going to be so helpful to the Court of Appeal because they will see that instead of playing your game, I went over each and every paragraph, and you and I engaged in a discussion.  So do you understand that we have gone over every one of these paragraphs?"  Jamerson-Keosodsay responded, "Wait, "you just read everything?"  The court replied, "I sure did."  Jamerson-Keosodsay asked, "Every sentence?"  The court answered, "I did.  It's over.  Do you still want to represent yourself?"  Jamerson-Keosodsay responded, "Yes."

## II

### *Guilty Verdicts and Aggravating Factor Findings*

After the jury found Jamerson-Keosodsay guilty on all counts, the prosecution presented evidence and argument to the jury on the aggravating factors that his unlawful possession of a firearm (1) was "of increasing seriousness" in relation to his earlier misdemeanor conviction and (2) occurred while he was on probation.  The jury found only the latter aggravating factor true.

## III

### *Sentencing*

At the outset of the sentencing hearing, the trial court stated that Jamerson-Keosodsay's attorney in a separate case had indicated Jamerson-Keosodsay might not be competent to stand trial and requested that sentencing be delayed so she could consult with him about representing him in this matter.  The trial court explained it had informed

6

that attorney Jamerson-Keosodsay had competently represented himself at trial and that, absent some indication at the sentencing hearing that he was not competent, sentencing would proceed. When Jamerson-Keosodsay did not respond to the court's announcement, the court initially viewed his silence as a potential basis to question his competency.

The prosecutor responded by noting that Jamerson-Keosodsay had previously been found competent to stand trial and had "score[d] high on the malingering test"; argued that a different legal standard would apply if the court were to revisit competency; and asserted that Jamerson-Keosodsay's silence during the hearing was "an intentional ploy," because he spoke to someone in the courtroom in the prosecutor's presence before the judge entered the courtroom. The prosecutor said, "[I]t's not that [Jamerson-Keosodsay] is incapable of speaking or doesn't understand the [c]ourt. I believe that he's refusing to speak on his own volition."

The trial court then addressed Jamerson-Keosodsay: "[A]re you asking that I appoint counsel for you in this case?" Jamerson-Keosodsay did not respond. "I'm taking that as a no," the court stated. "Since [Jamerson-Keosodsay] was quite insistent the last time I saw him that he wanted to represent himself, I am finding consistent with his destructive behavior during the trial, he is simply continuing that line of defense through sentencing." The court articulated its understanding that once a defendant has been found competent, that finding remains valid absent a substantial change in circumstances or new evidence casting serious doubt on its validity. Although Jamerson-Keosodsay's counsel in the other matter had "declared a doubt" in that case, she provided no supporting reasons, which the court acknowledged may have implicated attorney-client privilege but nonetheless left the court without evidence undermining the prior competency finding in this case.

The trial court also noted that a May 2024 psychological evaluation concluded Jamerson-Keosodsay was "most likely malingering" based on test results and clinical

7

observations. Finding no basis to revisit competency, the court proceeded to judgment and sentencing.

When Jamerson-Keosodsay declined to make a statement, the trial court imposed an upper term of three years for the felony conviction, along with three consecutive one-year county jail terms for the misdemeanor convictions. In selecting the upper term, the court relied on factors including that Jamerson-Keosodsay "was armed" and "engaged in violent conduct, which indicates a danger to society," as well as the jury's finding that he was on probation at the time of the offenses.

As to custody credits, the trial court awarded 308 days of actual time served but denied any conduct credits under section 4019, explaining that although Jamerson-Keosodsay otherwise would have been entitled to 308 days of such credits, they were forfeited due to 17 instances of custodial misconduct.

Jamerson-Keosodsay timely appealed, filing multiple notices of appeal in August, September, and October 2024. After both parties requested multiple extensions of time, Jamerson-Keosodsay filed his opening brief in September 2025, and briefing was completed on February 20, 2026.

## DISCUSSION

### I

### *The Trial Court Did Not Abuse Its Discretion By Granting*
### *Jamerson-Keosodsay's Request to Represent Himself*

Jamerson-Keosodsay contends the trial court erred by granting his request to represent himself. Specifically, he indicates the trial court erred because (1) his request was untimely, (2) he did not unequivocally waive his right to counsel, (3) he did not knowingly and intelligently waive that right, and (4) even if he was competent to stand trial, he was incompetent to represent himself. We are not persuaded.

8

As a threshold matter, Jamerson-Keosodsay's failure to tailor his arguments to the applicable standards of review is fatal to this claim. And setting that failure aside, his reasoning is unpersuasive.

A.    *Legal Background*

1.    *Self-Representation*

A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently." (*People v. Lynch* (2010) 50 Cal.4th 693, 721, abrogated in part on another ground by *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638.) But when, as here, the motion is not made within a reasonable time prior to the commencement of trial, whether to grant or deny the motion "is 'addressed to the sound discretion of the court.' " (*Lynch*, at p. 722.) "In assessing an untimely self-representation motion, the trial court considers such factors as 'the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " (*Id.* at p. 722, fn. 10.)

In *People v. Taylor* (2009) 47 Cal.4th 850, our Supreme Court held that the federal Constitution does not compel a state to adopt a different standard of competency for self-representation than the standard of competency used to determine if a defendant may stand trial while represented by counsel. (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1053 (*Weber*).) While states " ' "are free to adopt for mentally ill or mentally incapacitated defendants who wish to represent themselves at trial a competency standard that differs from the standard for determining whether such a defendant is competent to stand trial," ' " they are not *required* to do so. (*Ibid.* [United States Supreme Court case law " ' "does not *mandate* the application of … a dual standard of competency for mentally ill defendants" ' "].) Thus, " ' "the federal constitution is not violated when a

9

trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent." ' " (*Ibid.*)

### 2. *Standard of Review*

We independently examine the entire record to determine whether the defendant knowingly and intelligently waived the right to counsel. (*Weber*, *supra*, 217 Cal.App.4th at p. 1058.) " '[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' [Citation.] When courts engage in independent review, they should be mindful that ' "[i]ndependent review is *not* the equivalent of de novo review," ' " because an "appellate court may not simply second-guess factual findings that are based on the trial court's own observations." (*People v. Vivar* (2021) 11 Cal.5th 510, 527.) Rather, factual findings that are based on the trial court's own observations are entitled to particular deference." (*Ibid*.)

### 3. *Appellant's Burden*

A trial court's judgment is ordinarily presumed to be correct, and it is the appellant's burden to demonstrate, based on the appellate record and with meaningful legal analysis supported by citations to authority, that the trial court committed reversible error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; *In re S.C.* (2006) 138 Cal.App.4th 396, 408.) "When an appellant fails to apply the appropriate standard of review, the argument lacks legal force. 'Arguments should be tailored according to the applicable standard of appellate review.' [Citation.] When they are not so tailored, the appellant fails to show error in the judgment." (*People v. Foss* (2007) 155 Cal.App.4th 113, 126 (*Foss*); see *Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 (*Ewald*) ["counsel fails to articulate the standard of review on appeal, in and of itself a potentially fatal omission," because " ' "[a]rguments should be tailored according to the applicable standard of appellate review" ' "].)

B.    *Analysis*

In his opening brief, Jamerson-Keosodsay does not tailor his arguments to the applicable standards of review.  For this reason alone, he fails to carry his burden to show error in the judgment.  (*Foss*, *supra*, 155 Cal.App.4th at p. 126; *Ewald*, *supra*, 13 Cal.App.5th at p. 948.)  Without variation, he argues throughout his discussion of this issue that the trial court "erred."  And while he acknowledges in his reply brief that we review the trial court's decision to grant his untimely motion to represent himself for an abuse of discretion, in neither brief does he acknowledge that we *independently* review the trial court's determination that he unequivocally, knowingly, and intelligently asserted his right to represent himself.  This is important because, as explained above, under independent review the trial court's factual determinations that are based on its own observations are entitled to particular deference.  (*People v. Vivar*, *supra*, 11 Cal.5th at p. 527.)

In conducting our review, we have only a cold record.  But the trial court observed Jamerson-Keosodsay in person.  It had the benefit of body language, tone, and other nonverbal signals.  (*People v. Reynoso* (2003) 31 Cal.4th 903, 918, fn. 4 ["Typically, an appellate court has only a cold transcript," and "cannot experience what the trial judge experienced—the nuances, the inflections, the body language which traditionally" are "evaluated by triers of fact"]; *Weber*, *supra*, 217 Cal.App.4th at p. 1055 ["On a cold transcript we do not know the tone with which this comment was delivered"].)  And since, despite Jamerson-Keosodsay's protestations to the contrary, the trial court determined he *did* understand his constitutional rights and the warnings about representing himself, based at least in part on his demeanor during the colloquy, that determination is entitled to deference.

Given that deference, we conclude the trial court did not err in determining that, while Jamerson-Keosodsay did not *like* the warnings on the *Faretta* form, he understood

11

them and unequivocally, knowingly, and intelligently asserted his right to represent himself. We express no opinion on the trial court's method.

1.      *Untimeliness*

Jamerson-Keosodsay argues the trial court should have denied his self-representation motion because it was untimely. He offers reasons why the trial court might have denied his motion, including that he lacked significant portions of the discovery and expressed no substantive criticism of his appointed counsel. He further contends the trial court "had ample discretion to continue trial over the appellant's objection to permit newly-appointed counsel time to prepare." But these observations do not articulate a meaningful legal analysis that the trial court *abused its discretion* by granting the untimely motion for self-representation. (See *People v. Johnson* (2022) 12 Cal.5th 544, 605-606 [to establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it falls outside the bounds of reason or was made in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice].)

Jamerson-Keosodsay invokes *People v. Windham* (1977) 19 Cal.3d 121 for support of his assertion that the trial court should have denied his motion. But our Supreme Court explained in *People v. Clark* (1992) 3 Cal.4th 41, 109 that the " '*Windham* factors primarily facilitate efficient administration of justice, not protection of [a] defendant's rights.' " Thus, where, as here, the trial court *grants* a defendant's motion for self-representation at his own insistence, he may not complain of any error in the court's failure to weigh the *Windham* factors. (*Clark*, at p. 109.) Accordingly, any suggestion the trial court erred in failing to consider the *Windham* factors before granting his motion is unpersuasive.

We agree with the People that the record reflects Jamerson-Keosodsay wished to represent himself because he wanted to vindicate his statutory speedy trial right. That is a valid basis for granting an untimely self-representation motion. (See *People v. Lynch*,

12

*supra*, 50 Cal.4th at p. 722, fn. 10 ["In assessing an untimely self-representation motion, the trial court considers such factors as … 'the reasons for the request' "].)

Jamerson-Keosodsay's suggestion that his self-representation motion should have been denied *because* it was untimely is unpersuasive because a trial court has *discretion* to grant such a motion. And he has failed to demonstrate that the trial court abused its discretion.

2.      *Unequivocality*

Jamerson-Keosodsay provides no citation to the record in support of the contention that his waiver of the right to counsel was "conditional and equivocal." We may reject the contention for this reason alone. (See *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282-283 [failure to cite record forfeits issue on appeal]; cf. *People v. Stanley* (1995) 10 Cal.4th 764, 793 [the defendant "does not specify how the evidence fails to support the verdict," but "merely refers us to the statement of facts contained in his opening brief, apparently assuming this court will construct a theory supportive of his" claim; but that "is not our role"].)

Jamerson-Keosodsay invokes *People v. Lawley* (2002) 27 Cal.4th 102, 139-142 for support of the contention he did not unequivocally waive his right to counsel, but it is unclear precisely how he thinks the case helps his argument. He argues his case is "readily distinguishable" from *Lawley*, where the defendant "interposed no conditions or refusals into his responses to the trial court as he waived his right to counsel." But the relevant discussion in *Lawley* is largely about coercion and confusion, not unequivocality. (See *id.* at p. 140 ["the record does not substantiate defendant's contention that he … was coerced into self-representation"; "the circumstance … undermines his claim of coercion"]; *id.* at p. 142 ["The record suggests no confusion on defendant's part regarding the meaning of the admonitions, risks of self-representation"].) Cases are not authority for propositions not considered. (*People v. Brown* (2012) 54 Cal.4th 314, 330.)

The one sentence in the opinion that discusses the notion of unequivocality does not support Jamerson-Keosodsay's position; it undermines it. The defendant in *Lawley* claimed that his "waiver was … not unequivocal because he in fact wished to be represented by counsel." (*People v. Lawley*, *supra*, 27 Cal.4th at p. 140.) Our Supreme Court rejected the claim, reasoning that "the trial court told him" no counsel "would be found (given his refusal to waive his speedy trial right)." (*Ibid*.) Here, Jamerson-Keosodsay does not point to anything in the record of the July 2024 hearing that suggests he expressed a wish to be represented by counsel.

Jamerson-Keosodsay has failed to demonstrate that his waiver of the right to counsel was equivocal.

### 3. *Knowingly and Intelligently*

Jamerson-Keosodsay appears to argue he did not knowingly and intelligently waive his right to counsel because the trial court should have concluded he was going to "engage in problematic behaviors inconsistent with a fair trial." This undeveloped argument is a non sequitur. One may knowingly waive a right to counsel *and* indicate a likelihood to make trial difficult for everyone.

Jamerson-Keosodsay further argues that in the scenario of a guilty plea, no rational court would have viewed his behavior during the *Faretta* colloquy as consistent with a knowing and intelligent waiver of the right to a *trial*. Therefore, he reasons, the trial court wrongly found a valid waiver of his right to *counsel*. Even if the underlying premise of this argument is correct, this is not an "apples to apples" comparison. Criminal defendants who plead guilty subject themselves to punishment; but criminal defendants who waive their right to counsel *may be acquitted*. (See *People v. Jackio* (2015) 236 Cal.App.4th 445, 453-454 [emphasizing the "significant" "difference in procedural settings" between a defendant who pleads guilty and a defendant who "represents himself" and "may be acquitted"].) And even if ultimately convicted, criminal defendants who represent themselves have exercised their autonomy. (Cf.

14

*Weber*, *supra*, 217 Cal.App.4th at 1054-1055 [" 'Out of fidelity to' " the value of " 'dignity and autonomy of the individual' " a " 'defendant's choice [to waive counsel] must be honored even if he opts foolishly to go to hell in a handbasket' "].)

Jamerson-Keosodsay has failed to demonstrate that his waiver of the right to counsel was not knowing and intelligent.

    4.    *Competency to Represent Himself*

Jamerson-Keosodsay argues the "effect of the trial court's decision to allow [him] to waive counsel was to deprive [him] of his constitutional right to counsel," because, even though he may have been competent to stand trial, he was not competent to represent himself. Once again, Jamerson-Keosodsay does not tailor his arguments to an applicable standard of review. Indeed, he never identifies one. This results in a failure to carry his burden to show reversible error. (*Foss*, *supra*, 155 Cal.App.4th at p. 126; *Ewald*, *supra*, 13 Cal.App.5th at p. 948.)

A trial court has no duty to "routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering *denying* self-representation due to doubts about the defendant's mental competence." (*People v. Johnson* (2012) 53 Cal.4th 519, 530; see *Weber*, *supra*, 217 Cal.App.4th at pp. 1053-1054 [" 'the federal constitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial' "].) And the trial court's decision here not to conduct an inquiry into the question of Jamerson-Keosodsay's competence to represent himself appears to have been a matter of discretion. (*Johnson*, at pp. 530-532; cf. *People v. Waldon* (2023) 14 Cal.5th 288, 307 [the trial court abused its discretion by intentionally ignoring evidence undergirding the earlier *Faretta* denial by a different judge and granting the defendant's motion to represent himself, because "[w]hen there is reason to doubt a defendant's mental capacity to waive counsel, the court's determination should be made after a careful inquiry"].)

Jamerson-Keosodsay does not persuasively demonstrate how the trial court abused its discretion in declining to conduct a second, self-representation and competency inquiry. (See *Weber*, *supra*, 217 Cal.App.4th at pp. 1053 [United States Supreme Court case law " ' "does not *mandate* the application of … a dual standard of competency for mentally ill defendants" ' "].) He asserts in conclusory fashion and without citation to the record that the *Faretta* colloquy "clearly indicated he was uncapable [*sic*] of understanding the court's basic questions and what was expected of a defendant seeking to represent himself at trial." To the contrary, and given the particular deference owed to the trial court's factual findings and observations, the colloquy does not clearly indicate that. The trial court's findings that Jamerson-Keosodsay understood, but did not like, aspects of self-representation are entirely plausible. Indeed, the trial court's remark to Jamerson-Keosodsay that the record would "be so helpful to the Court of Appeal because they will see that instead of playing your game, I went over each and every paragraph, and you and I engaged in a discussion," suggests it determined his behavior was an effort to "inject reversible error into the case by insisting on his right to proceed without counsel, but thwarting the trial court's ability to complete standard *Faretta* admonitions." (*Id.* at p. 1045.) The first claim of error is unpersuasive.

## II

### *The Trial Court Did Not Abuse Its Discretion By*

### *Permitting Continued Self-Representation*

Jamerson-Keosodsay's second claim of error in his opening brief is that the trial court should not have allowed him to *continue* representing himself after he engaged in conduct that reflected an "inability to meaningfully understand proceedings" and a lack of a "willingness to appropriately represent himself." Put another way, he asserts the trial court "should have recognized that" his conduct "jeopardized … a fair trial." This claim is unpersuasive because the authority invoked for support is inapposite.

16

As Jamerson-Keosodsay states at the beginning of his discussion of this claim, the rule he invokes concerns a trial court's discretion to terminate self-representation by a defendant who deliberately engages in serious and obstructionist *misconduct*. That rule is inapplicable here because Jamerson-Keosodsay's argument is, in essence, that the trial court should have reconsidered his *competency* to represent himself. Continued competence to represent oneself is a different question from disruptiveness. Jamerson-Keosodsay cites no authority for the proposition that the trial court had a continuous duty throughout trial to inquire into his competence to represent himself. (See *People v. Johnson*, *supra*, 53 Cal.4th at p. 530 [no duty to "routinely inquire into the mental competence of a defendant seeking self-representation"].)

Further, Jamerson-Keosodsay has not demonstrated an abuse of discretion. As the People note, *People v. Welch* (1999) 20 Cal.4th 701, 735 stands for the propositions that (1) a trial court has "much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse,' " and (2) because "the extent of a defendant's disruptive behavior may not be fully evident from the cold record," "the trial court … is in the best position to judge defendant's demeanor" in relation to disruptive conduct. (*Ibid.*) Here, Jamerson-Keosodsay identifies discrete moments during trial that, he indicates, suggested his incompetence to represent himself.[3] To the extent the contention is that these moments reflect *disruptive* behavior, we are not persuaded the trial court abused its discretion by nevertheless permitting him to continue representing himself. (*Ibid.* [standard of review].) Such an analysis is particularly difficult to conduct when the

---

[3] He points to his suboptimal efforts to impeach and subpoena witnesses; the trial court's threat to declare a doubt as to his competence during the sentencing hearing; his decision to wear jail clothing during trial; and his conduct that prompted the trial court, in the jury's presence, to threaten to sanction and remove him.

trial court did *not* terminate self-representation, and presumably and understandably therefore saw no need to create a record in this regard. (Cf. *People v. Becerra* (2016) 63 Cal.4th 511, 519 ["we review a *Faretta* revocation order for abuse of discretion," and "it is incumbent upon the court to create a record that permits meaningful review of the basis for its ruling"]; *ibid*. ["deciding whether to terminate a defendant's pro per status present a trial court with particular complexities"].)

Accordingly, the second claim of error is unpersuasive. We decline to address the argument raised for the first time in Jamerson-Keosodsay's reply brief—that the trial court did not appear to exercise *informed* discretion with respect to his continued self-representation. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [arguments not raised in the opening brief are forfeited].)

### III

### *Sentencing Error*

The parties agree the trial court erred at sentencing when it imposed the upper term for Jamerson-Keosodsay's felony conviction by relying on (1) an element of the offense and (2) an aggravating circumstance the jury did not find. We agree the trial court improperly relied on an aggravating circumstance the jury did not find.[4]

A circumstance that is an element of the substantive offense cannot be used as a factor in aggravation. (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1261.) But this prohibition applies only if the crime *as defined by statute* cannot be accomplished without performance of the acts which constitute such factor. (*Id.* at p. 1262.) Here, while the parties agree that "possession" is an element of unlawful possession of a

---

[4] The People contend Jamerson-Keosodsay forfeited these claims by not raising them in the trial court. We exercise our discretion to consider them in the interests of justice. (See *People v. Nguyen* (2025) 109 Cal.App.5th 1133, 1143 ["in the interests of justice … we have decided to overlook … forfeiture, and remand the matter for resentencing"].)

firearm within 10 years of certain misdemeanor convictions, the crime defined by section 29805, subdivision (a)(1),[5] the statutory definition of the crime is broader. In addition to possession, a prohibited person violates the statute by owning, purchasing, receiving, or having custody or control of any firearm. (§ 29805, subd. (a)(1).) Accordingly, because the crime arguably can be accomplished without physical possession, it is not clear that the trial court erred by relying on Jamerson-Keosodsay's possession when imposing the upper term.

We need not decide the issue, however, because we agree with the parties that the trial court clearly erred by relying on an aggravating circumstance that the jury did not find—i.e., that Jamerson-Keosodsay "engaged in violent conduct, which indicates a danger to society." (See Cal. Rules of Court, rule 4.421(b)(1); *People v. Wiley* (2025) 17 Cal.5th 1069, 1076 [criminal defendants are entitled to a jury trial on all aggravating facts, other than the bare fact of a prior conviction and its elements, that expose them to imposition of a sentence more serious than the statutorily provided midterm].)

The People make no argument a jury would have found true this aggravating circumstance, and we do not have enough confidence to conclude beyond a reasonable doubt that a jury would have. (See *People v. Wiley*, *supra*, 17 Cal.5th at p. 1087 [this kind of sentencing error requires reversal and remand unless the reviewing court concludes beyond a reasonable doubt that a jury would have found true all aggravating facts relied on to justify the upper term; the error is not harmless if the record contains evidence that could rationally support a contrary finding regarding the aggravating fact at issue].) We believe a rational jury could have concluded that Jamerson-Keosodsay's act

---

[5] Indeed, the jury's verdict reflects a "possession" finding.

of waving a gun toward a group of people did not constitute "violent conduct." Accordingly, we remand for a full resentencing.[6]

IV

*Two of the "Brandishing" Misdemeanors Must Be Stricken*

The parties also agree that under *In re Peter F.* (2005) 132 Cal.App.4th 877, Jamerson-Keosodsay's single act of brandishing a firearm in the presence of multiple people can support only a single conviction for brandishing. We agree. (See *id.* at p. 881 [because "brandishing a deadly weapon in the presence of another person is not a crime of violence 'upon' that person, but is committed in someone's presence," "a single act of brandishing can only support a conviction of a single count … no matter how many people witness the act"].)

The People contend remand for resentencing *on this error* is unwarranted because the trial court imposed the maximum possible sentence and therefore would not exercise its discretion differently on remand. But since there must be a full resentencing, this contention is unavailing. (See *Codinha*, *supra*, 92 Cal.App.5th at p. 994 [The general rule is that on remand for resentencing the trial court may reconsider all sentencing choices].)

V

*Section 4019 Credits*

We agree with the parties that the trial court erred in denying section 4019 conduct credits to Jamerson-Keosodsay at sentencing without giving him notice that it might do so. (See *People v. Lara* (2012) 54 Cal.4th 896, 906 ["defendant is entitled to … notice of the facts that restrict his ability to earn credits and, if he does not admit them, a

---

[6] Given our remand for a full resentencing, it is unnecessary to adjudicate Jamerson-Keosodsay's contention that resentencing is also warranted on another ground. (*People v. Codinha* (2023) 92 Cal.App.5th 976, 996 (*Codinha*).)

reasonable opportunity to prepare and present a defense"].)  Though the People contend this issue is forfeited because it was not raised in the trial court, the issue can be addressed at resentencing.  (*Codinha*, *supra*, 92 Cal.App.5th at p. 994.)

DISPOSITION

The felony conviction (§ 29805, subd. (a)(1)) and one misdemeanor conviction (§ 417, subd. (a)(2)) are affirmed.  Two of the misdemeanor convictions are reversed. The matter is remanded for a full resentencing.


/s/ _____
BOULWARE EURIE, J.


We concur:



/s/ _____
HULL, Acting P. J.



/s/ _____
RENNER, J.